No. 24-2927

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, *et al.*,

*Plaintiffs-Appellees*,

v.

TODD ROKITA, RYAN MEARS *and* KERRY FORESTAL,
*in their official capacities*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the
Southern District of Indiana
Case No. 1:23-cv-1805 (Hon. James R. Sweeney, II)

## ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES

Grayson Clary
*Counsel of Record for*
  *Plaintiffs-Appellees*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2927</u>

Short Caption: <u>Reporters Committee for Freedom of the Press et al. v. Todd Rokita et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Reporters Committee for Freedom of the Press; Indiana Broadcasters Association; Indiana Professional Chapter of the</u>

<u>Indianapolis Star; Nexstar Media Inc.; Scripps Media Inc.; TEGNA Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Reporters Committee for Freedom of the Press</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>See following page</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>See following page</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Grayson Clary</u>      Date: <u>02/12/2025</u>

Attorney's Printed Name: <u>Grayson Clary</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: <u>1156 15th Street NW, Suite 1020</u>

          <u>Washington, DC 20005</u>

Phone Number: <u>(202) 795-9300</u>      Fax Number: <u>(202) 795-9310</u>

E-Mail Address: <u>gclary@rcfp.org</u>

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The Reporters Committee is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

The Indiana Broadcasters Association is a 501(c)(6) not-for-profit trade association with no parent corporation and no stock.

The Indiana Professional Chapter of the Society of Professional Journalists has no parent corporation and no stock.

The Indianapolis Star is a subsidiary of Gannett Satellite Information Network, LLC.

Nexstar Media Inc. has no corporate parent company and no publicly held corporation has a 10% or greater ownership interest in its stock.

Scripps Media, Inc. is a Delaware corporation. The E.W. Scripps Company ("EWS") is the parent company of Scripps Media, Inc. ("SMI"). EWS is a public company and owns 100% of the outstanding capital stock of SMI.

TEGNA Inc. has no corporate parent company and no publicly held corporation has a 10% or greater ownership interest in its stock.

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT............................................ ii

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION.......................................................................................1

STATEMENT OF JURISDICTION .......................................................5

STATEMENT OF THE ISSUES............................................................6

STATEMENT OF THE CASE ...............................................................7

STANDARD OF REVIEW ...................................................................25

SUMMARY OF ARGUMENT ............................................................26

ARGUMENT ...........................................................................................27

    I.    Appellees have standing to challenge the Act....................................27

    II.    The Act is void for vagueness under the Due Process Clause. .........33

        A.    The Act delegates arbitrary discretion to law enforcement officers to decide which of the countless individuals who approach within 25 feet should be ordered to retreat. ...............33

        B.    The Act fails to provide members of the public and the press fair warning of the conduct that will prompt an order to retreat...............................................................................42

    III.    The Act violates the First Amendment. ...............................................47

        A.    The Act violates the First Amendment as applied to Appellees' peaceful, nonobstructive newsgathering in public places. ...................................................................................48

        B.    The Act violates the First Amendment on its face. .....................59

CONCLUSION ........................................................................................65

CERTIFICATE OF COMPLIANCE..................................................66

CERTIFICATE OF SERVICE.................................................................67

# TABLE OF AUTHORITIES

**Cases**

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
846 F.3d 391 (D.C. Cir. 2017) ............................................................35

*Agnew v. Gov't of Dist. of Columbia*,
920 F.3d 49 (D.C. Cir. 2019) ........................................................37, 38

*Am. C.L. Union of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ............................................51, 53, 58, 59

*Anderson v. U.S.F. Logistics (IMC), Inc.*,
274 F.3d 470 (7th Cir. 2001) ........................................................3, 47

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ...................................................*passim*

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) .....................................................*passim*

*California v. Texas*,
593 U.S. 659 (2021) .....................................................................31

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ..................................................................*passim*

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ................................................................*passim*

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971) ....................................................................46

*Colten v. Kentucky*,
407 U.S. 104 (1972) ................................................................52, 64

*Common Cause Ind. v. Lawson,*
    937 F.3d 944 (7th Cir. 2019) ....................................................22, 28

*Deep South Today v. Murrill,*
    No. 3:24-cv-00623, slip op. (M.D. La. Jan. 31, 2025) ...........................*passim*

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ....................................................................49, 50

*Frisby v. Schultz,*
    487 U.S. 474 (1988) .........................................................................54

*Gaudiya Vaishnava Soc'y v. City & Cnty. of San Francisco,*
    952 F.2d 1059 (9th Cir. 1990) ....................................................52, 53

*Glik v. Cunniffe,*
    655 F.3d 78 (1st Cir. 2011) ..............................................................54

*Goldhamer v. Nagode,*
    611 F. Supp. 2d 784 (N.D. Ill. 2009),
    *vacated on other grounds,*
    *Schirmer v. Nagode,* 621 F.3d 581 (7th Cir. 2010) ...........................51

*Hodgkins ex rel. Hodgkins v. Peterson,*
    355 F.3d 1048 (7th Cir. 2004) ....................................................51, 63

*In re Cassidy,*
    892 F.2d 637 (7th Cir. 1990) ...........................................................31

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.,*
    *UAW v. Johnson,*
    674 F.2d 1195 (7th Cir. 1982),
    *rev'd on other grounds,* 499 U.S. 187 (1991) ..............................31, 32

*Johnson v. United States,*
    576 U.S. 591 (2015) .........................................................................34

*Jordan v. Jenkins,*
　73 F.4th 1162 (10th Cir. 2023) .................................................49, 51

*Kolender v. Lawson,*
　461 U.S. 352 (1983) ........................................................3, 36, 41, 42

*Majors v. Abell,*
　317 F.3d 719 (7th Cir. 2003) .....................................................21, 28

*Marcavage v. City of Chicago,*
　659 F.3d 626 (7th Cir. 2011) ...........................................................49

*McCullen v. Coakley,*
　573 U.S. 464 (2014) ...............................................................58, 62, 63

*Nicodemus v. City of South Bend,*
　711 F. Supp. 3d 1015 (N.D. Ind. 2024)........................................21, 30, 63, 64

*Perkins v. Hart,*
　No. 22-30456, 2023 WL 8274477 (5th Cir. Nov. 30, 2023) ...........................54

*Planned Parenthood of Ind. & Ky., Inc. v. Marion Cnty. Prosecutor,*
　7 F.4th 594 (7th Cir. 2021) ...............................................35, 42, 47

*Randall v. Sorrell,*
　548 U.S. 230 (2006) .........................................................................57

*Reed v. Lieurance,*
　863 F.3d 1196 (9th Cir. 2017) .........................................................52

*Schenck v. Pro-Choice Network of W. N.Y.,*
　519 U.S. 357 (1997) .........................................................................59

*Shuttlesworth v. City of Birmingham,*
　382 U.S. 87 (1965) .................................................................*passim*

*Sigman v. Town of Chapel Hill,*
　161 F.3d 782 (4th Cir. 1998) ...........................................................55

*Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n,*
  742 F.3d 282 (7th Cir. 2014) ...................................................49

*Smith v. Goguen,*
  415 U.S. 566 (1974) ...........................................................35

*Speech First, Inc. v. Killeen,*
  968 F.3d 628 (7th Cir. 2020) ...........................................27, 32

*Stuller, Inc. v. Steak N Shake Enters., Inc.,*
  695 F.3d 676 (7th Cir. 2012) ...........................................24, 25

*Teel v. Lozada,*
  826 F. App'x 880 (11th Cir. 2020) .......................................57

*Thornhill v. Alabama,*
  310 U.S. 88 (1940) .............................................................36

*Uzuegbunam v. Preczewski,*
  592 U.S. 279 (2021) .......................................................29, 32

*Weinberg v. City of Chicago,*
  310 F.3d 1029 (7th Cir. 2002) ............................................59

*Wis. Right to Life, Inc. v. Barland,*
  751 F.3d 804 (7th Cir. 2014) ..............................................52

**Statutes**

28 U.S.C. § 1292 ..........................................................................5

28 U.S.C. § 1331 ..........................................................................5

28 U.S.C. § 1343 ..........................................................................5

Fla. Stat. § 843.31 ......................................................................57

Ind. Code § 35-44.1-2-14 ....................................................*passim*

Ind. Code § 35-44.1-3-1 ...................................................................51

Ind. Code § 35-44.1-4-1.5 ..............................................................29

Ind. Code § 35-44.1-4-2 ..................................................................30

Ind. Code § 35-44.1-4-5 ..................................................................29

Ind. Code § 35-50-3-4 ......................................................................13

**Other Authorities**

Andrew Smith, *Here's What Happened with Protests and Demonstrations this Weekend in Downtown Indianapolis*, WRTV (June 1, 2020), https://perma.cc/5B8L-AG2M .........................................................8

Bob Blake, *Police, Protesters Have Moment of Unity During Protest Near Governor's Residence*, WRTV (June 2, 2020), https://perma.cc/3AAJ-7E4W .....................................................8, 9

Christian Sheckler, *South Bend Police Has No Mandatory De-escalation Training, but 7 'Combat Shoots' Each Year*, S. Bend Trib. (July 8, 2020), https://perma.cc/E8N9-ZDKD .......................................................56

Cierra Putman, *IMPD Chief Believes Crackdown on Violent Crime is Working*, WTHR (Dec. 15, 2022), https://perma.cc/P444-299B..........................................................10

Complaint, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 8, 2023) ................................................................14

Dave Brown & Randy LaHaie, *The Myth of the '21-Foot' Rule*, Blue Line (Dec. 28, 2020), https://perma.cc/X2YP-CU86..........................................................56

Dirk Rowley, *Peaceful Protests Turn Violent, Police Arrest 29*,
    WANE 15 (May 29, 2020),
    https://perma.cc/GMU9-AV4B ..................................................................8, 9

Elizabeth DePompei, *'Highly Upsetting': Report Says IMPD Was
    Unprepared in George Floyd, Dreasjon Reed Protests*,
    IndyStar (Feb. 26, 2021),
    https://perma.cc/6NMJ-TYEQ..........................................................................9

Emily Hockett, *Efforts to Criminalize 'Encroachment' on Police Encroach
    on First Amendment Rights*,
    Reporters Comm. for Freedom of the Press (June 26, 2023),
    https://perma.cc/8S68-9L22 ...........................................................................18

FOX59 News, *Live Interview: Update on Two Officers Shot in Mitchell,
    Indiana*, YouTube (Feb. 5, 2023),
    https://perma.cc/8ZCH-F727.........................................................................10

FOX59 News, *MCSO Press Conference into Deputy Durm's Death
    Investigation*, YouTube (Aug. 30, 2023),
    https://perma.cc/UNW7-F5T7.......................................................................10

Hearing on HB 1186 Before the S. Comm. on Corr. & Crim. L.,
    123d Gen. Assemb., Reg. Sess. (Ind. Mar. 7, 2023),
    https://iga.in.gov/session/2023/video/committee_corrections_and_c
    riminal_law_3000/ ...........................................................................................13

Joe Mutascio, *This Weekend Marks 1 Year Since Protests, Riots Rocked
    Indianapolis. Here's a Look Back*, IndyStar (May 28, 2021),
    https://perma.cc/7QDF-MKBT.........................................................................8

John Doran, *City Leaders, Police Call on Public's Help to Reduce Violent
    Crime*, WTHR (Apr. 27, 2023),
    https://perma.cc/CYN7-JL3X ..........................................................................9

John Doran, *Woman Arrested Under New Indiana Law for Filming Police Within 25 Feet*, WTHR (Oct. 4, 2023), https://perma.cc/P3SF-VQR2 ..........................................................................14

Kayla Molander, *Thousands Rally in Indianapolis Following Roe v Wade Decision*, WRTV (June 26, 2022), https://perma.cc/C543-6MJ6...........................................................................9

Kelly McLaughlin, *Police Training Programs Have a Pseudoscience Problem*, Bus. Insider (June 17, 2020), https://perma.cc/6SMX-7UV8 ........................................................................56

Kelly Wilkinson, *K-9 Parade for Immunocompromised Child Is Like Being with Family*, IndyStar (Apr. 14, 2020), https://perma.cc/P22W-B692............................................................................9

*Legal Hotline*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/legal-hotline/ (last visited Feb. 10, 2025) ...............19

Martin Vassolo & David Ovalle, *Miami Beach Suspends Law Used by Cops to Arrest People Who Film Them. Training Ordered*, Miami Herald (Aug. 20, 2021), https://bit.ly/3sGpzgF ....................................................................................19

Matt McKinney, *WATCH: IMPD Officer Gets Emotional After 1-Year-Old Shot and Killed*, WRTV (Mar. 29, 2018), https://perma.cc/8Q4P-6HFQ........................................................................10

Police Exec. Rsch. Forum, Guiding Principles on Use of Force (2016), https://perma.cc/46R9-XE7N.......................................................................57

*Police Use Tear Gas Again to Disperse Crowd During Second Day of Protests*, WANE 15 (May 30, 2020), https://perma.cc/3H2G-98UQ ......................................................................8

Reporters Comm. for Freedom of the Press, Police, Protesters, and the
    Press (Mar. 2024),
        https://www.rcfp.org/resources/police-protesters-and-the-press/............18

Richard A. Webster, *Video of Mother's Arrest Raises Questions About 25-
    Foot Buffer Law*, La. Illuminator (June 9, 2023),
        https://perma.cc/L4TC-YADT........................................................................54

S. Mot. MO118604, 123d Gen. Assemb., Reg. Sess. (Ind. 2023),
        https://perma.cc/2SPE-8FRA..........................................................................13

S. Mot. MO118606, 123d Gen. Assemb., Reg. Sess. (Ind. 2023),
        https://perma.cc/P35T-AUYS..................................................................13, 62

*Trainings*, Reporters Comm. for Freedom of the Press,
        https://www.rcfp.org/trainings/ (last visited Feb. 10, 2025).......................18

WTHR, *2nd Night of Protests in Indianapolis*, YouTube (May 30, 2020),
        https://perma.cc/VW42-26K8...........................................................................8

**INTRODUCTION**

More than fifty years ago, the Supreme Court made clear that a statute that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" would be so flagrantly unconstitutional as to "need[] no demonstration." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965). Indiana enacted precisely that statute, delegating police officers standardless discretion to prevent the public and the press from approaching near enough to document the way they perform their duties. *See* Ind. Code § 35-44.1-2-14 (hereinafter "the Act"). Under its plain terms, an officer may (or may not) order anyone who approaches within 25 feet to retreat on pain of arrest and prosecution—for any reason or for no reason. That includes countless ordinary citizens of Indiana engaged in wholly innocent conduct, as well as any number of journalists, including those employed by Appellees, who approach within 25 feet of law enforcement officers every day to gather news on matters of urgent public concern.

The District Court rightly found the Act void for vagueness on two independent grounds—both because it "invites arbitrary and

discriminatory enforcement," *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012), and because the public "lacks warning about the behavior that prompts a lawful dispersal order," *id.* at 462. Attempting to defend the law, Appellants argue that both officers and citizens know what it prohibits: failing to obey an order after receiving one. But as the Supreme Court explained in *City of Chicago v. Morales*, 527 U.S. 41 (1999), that defense is circular. The fact "that the ordinance does not permit an arrest until after a dispersal order has been disobeyed does not provide any guidance to the officer deciding whether such an order should issue" in the first place, *id.* at 62 (majority opinion), and an order "cannot retroactively give adequate warning of the boundary between the permissible and the impermissible" when the statute draws no such line, *id.* at 59 (plurality opinion). Because the Act fails to "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order," it "permits law enforcement too much discretion" in violation of due process. *Bell*, 697 F.3d at 463.

Put differently, as Appellants themselves concede, "it is not a crime to be within 25 feet of an officer," Opening Br. for Defs.-Appellants at 28,

but the Act tells neither officers nor the public which of the staggering number of individuals who pass within 25 feet of an officer every day—for harmless reasons and to exercise "important First Amendment rights," SA21—should be ordered to retreat on threat of criminal liability. That is textbook vagueness, and while the District Court found no need to reach the issue, the First Amendment likewise prohibits that chilling result. *See Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001) ("An appellate court may affirm on any ground that has a basis in the record."). Through either lens, conditioning the right to gather the news on the "moment-to-moment judgment of the policeman on his beat" violates the Constitution. *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (citation omitted).

Perhaps because Indiana's 25-foot law cannot stand on the merits, Appellants urge the Court to avoid reaching them, arguing that Appellees are not injured by a statute that attaches new criminal penalties to First Amendment activity in which they engage every day. But the standing inquiry in this case is straightforward: Appellees' reporters routinely approach within 25 feet of officers in a range of legitimate contexts to

gather the news, and the District Court found that Appellees' journalists have in fact "been asked to move back by law enforcement officers while gathering news" since the 25-foot law was adopted, "establishing that their fear of enforcement is well-founded," SA11. Appellants now speculate that those orders might have been issued under a different statute, but the record before the District Court demonstrated otherwise, *see* Supp. App. 4, and in any event Appellants do not dispute that the Act multiplies the penalties Appellees face when gathering the news within 25 feet of an officer. Because Appellees demonstrated a chilling effect on their First Amendment rights and a credible threat that the Act will be enforced against them—as it already has—the District Court correctly found that Appellees have standing to challenge the Act's unconstitutional burdens.

In each respect, Appellants' effort to defend a statute "indistinguishable from the law [the Supreme Court] held invalid in *Shuttlesworth v. Birmingham*" is meritless. *Morales*, 527 U.S. at 58–59 (plurality opinion). For the reasons given herein, Appellees respectfully urge this Court to affirm the District Court's preliminary-injunction order.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. *See* SA11 (finding that Appellees demonstrated Article III standing). This Court has jurisdiction over this appeal of the District Court's decision granting injunctive relief under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the District Court correctly concluded that Appellees, including news organizations whose employees routinely approach within 25 feet of law enforcement officers and receive directions to retreat, have standing to challenge a law adding new criminal penalties to those orders.

2.      Whether the District Court correctly concluded that Indiana's 25-foot law, under which an officer may order the public and press to retreat for any reason or no reason under threat of arrest, fails to provide adequate guidance to officers deciding whether such an order should issue.

3.       Whether the District Court correctly concluded that Indiana's 25-foot law, under which an officer may order the public and press to retreat for any reason or no reason under threat of arrest, fails to provide fair notice of the conduct that will prompt issuance of an order to retreat.

4.      Whether Indiana's 25-foot law is independently unconstitutional under the First Amendment, either on its face or as applied to Appellees' peaceful, nonobstructive newsgathering in public.

## STATEMENT OF THE CASE

**I.  Appellees' newsgathering brings their journalists within 25 feet of law enforcement officers in Indiana on a routine basis.**

Appellees are the Reporters Committee for Freedom of the Press, the Indianapolis Star ("IndyStar"), Nexstar Media Inc. ("Nexstar"), Scripps Media, Inc. ("Scripps"), TEGNA Inc. ("TEGNA"), the Indiana Professional Chapter of the Society for Professional Journalists ("IndyProSPJ"), and the Indiana Broadcasters Association ("IBA")—organizations that gather and report the news in Indiana or otherwise represent the interests of reporters and news organizations working across the state.  *See* Dkt. 1. (Compl.) ¶ 27.

IndyStar and the Indiana-based stations of Nexstar, Scripps, and TEGNA—all of which are in the business of regularly gathering and publishing newsworthy information, *see* Dkt. 1 (Compl.) ¶ 27, and all of which employ professional journalists assigned to cover the activities of Indiana law enforcement on an ongoing basis, *see id.*—routinely document the manner in which law enforcement officers perform their official duties in public places, *see id.*  The same is true of the individual journalist

members of IndyProSPJ, *see* Supp. App. 14[1] (declaration of IndyProSPJ

member Robert Scheer), and the individual station members of the IBA.

For instance, IndyStar reported extensively on the 2020 protests that

followed the murder of George Floyd.  *See* Joe Mutascio, *This Weekend*

*Marks 1 Year Since Protests, Riots Rocked Indianapolis.  Here's a Look Back*,

IndyStar (May 28, 2021), https://perma.cc/7QDF-MKBT (collecting stories).

The same is true of Nexstar station WANE 15, *see* Dirk Rowley, *Peaceful*

*Protests Turn Violent, Police Arrest 29*, WANE 15 (May 29, 2020),

https://perma.cc/GMU9-AV4B; *Police Use Tear Gas Again to Disperse Crowd*

*During Second Day of Protests*, WANE 15 (May 30, 2020),

https://perma.cc/3H2G-98UQ; Scripps station WRTV, *see* Andrew Smith,

*Here's What Happened with Protests and Demonstrations this Weekend in*

*Downtown Indianapolis*, WRTV (June 1, 2020), https://perma.cc/5B8L-AG2M;

Bob Blake, *Police, Protesters Have Moment of Unity During Protest Near*

*Governor's Residence*, WRTV (June 2, 2020), https://perma.cc/3AAJ-7E4W;

---

[1]    In this brief, citations to "Supp. App." refer to Appellees'
concurrently filed Supplemental Appendix, while citations to "SA" refer—
as in Appellants' opening brief—to Appellants' Short Appendix.

and TEGNA's station WTHR, *see* WTHR, *2nd Night of Protests in Indianapolis*, YouTube (May 30, 2020), https://perma.cc/VW42-26K8.

That reporting required Appellees' journalists to be within close proximity to law enforcement officers in Indianapolis, and it often relied on videos or photographs that were captured within 25 feet of officers performing their duties. *See, e.g.*, Elizabeth DePompei, *'Highly Upsetting': Report Says IMPD Was Unprepared in George Floyd, Dreasjon Reed Protests*, IndyStar (Feb. 26, 2021), https://perma.cc/6NMJ-TYEQ; Blake, *Police, Protesters Have Moment of Unity*, *supra*; Rowley, *Protests Turn Violent*, *supra*.

A broad range of other assemblies, rallies, and public events bring Appellees' journalists into close contact with law enforcement on a regular basis. *See, e.g.*, John Doran, *City Leaders, Police Call on Public's Help to Reduce Violent Crime*, WTHR (Apr. 27, 2023), https://perma.cc/CYN7-JL3X; Kayla Molander, *Thousands Rally in Indianapolis Following Roe v Wade Decision*, WRTV (June 26, 2022), https://perma.cc/C543-6MJ6; Kelly Wilkinson, *K-9 Parade for Immunocompromised Child Is Like Being with Family*, IndyStar (Apr. 14, 2020), https://perma.cc/P22W-B692. Appellees' journalists also

approach well within 25 feet of officers performing their official duties in other journalistic contexts, including when covering fires and crime scenes,[2] and in interviews and press conferences held by public officials.[3]

In total, in the course of their work, individual journalists employed by Appellees come into close contact with officers "three or four times" a week, Supp. App. 2, sometimes as often as "multiple times a day" depending on the news cycle, Supp. App. 15. Scott Hums, Content Director for WTHR, estimates that journalists across his newsroom "come into close contact with law enforcement officers multiple times every day." Supp. App. 9. And while Appellees' journalists "make a point of avoiding interfering" with law enforcement officers, Supp. App. 16; *see also* Supp.

---

[2]    *See, e.g.*, FOX59 News, *Live Interview: Update on Two Officers Shot in Mitchell, Indiana*, YouTube (Feb. 5, 2023), https://perma.cc/8ZCH-F727 (Nexstar station); Matt McKinney, *WATCH: IMPD Officer Gets Emotional After 1-Year-Old Shot and Killed*, WRTV (Mar. 29, 2018), https://perma.cc/8Q4P-6HFQ.

[3]    *See, e.g.*, FOX59 News, *MCSO Press Conference into Deputy Durm's Death Investigation*, YouTube (Aug. 30, 2023), https://perma.cc/UNW7-F5T7; Cierra Putman, *IMPD Chief Believes Crackdown on Violent Crime is Working*, WTHR (Dec. 15, 2022), https://perma.cc/P444-299B.

App. 5, 11, doing their jobs frequently requires them to "get as close as [they] can—well within twenty-five feet—to capture high-quality sound and video, speak to law enforcement officers about what's going on, and hear what people on the scene are saying to each other."  Supp. App. 2.

Based on their professional experience and judgment, Appellees' journalists—whether they are taking photographs, recording video, or visually observing newsworthy events to report on them accurately— "often need to be within 15–20 feet, if not closer, to get a clear picture" or "to avoid an obstructed view."  Supp. App. 2; *see also* Supp. App. 10, 16. Obtaining audio "that is consistently acceptable for broadcast" typically requires being "within 5–10 feet away," and "even closer" where background noise is present.  Supp. App. 10; *see also* Supp. App. 27.  In the experience of WTHR's Hums, high-quality audio and visual recordings and photographs are "uniquely valuable" to journalistic work because they "help transport viewers to what is happening on the scene," especially in the context of fast-moving "breaking news" scenarios.  Supp. App. 10.

Even when Appellees' journalists are not taking photographs or recording video or audio, approaching within close proximity to law enforcement is frequently necessary for them to do their jobs. Appellees' journalists have described needing to be within 25 feet to conduct on-the-scene interviews; they are "able to gather more information at a scene when [they] ask questions of law enforcement or witnesses from a close distance because it feels more conversational." Supp. App. 3. As Hums explained, "if our reporters are too far away to get a clear view of the scene, they have no way of knowing what questions to ask." Supp. App. 10.

## II.    Indiana adopts the 25-foot law.

On April 20, 2023, Indiana Governor Eric Holcomb signed into law HB 1186, which, in relevant part, makes it a criminal offense to "knowingly or intentionally approach[] within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching." Ind. Code § 35-44.1-2-14. The Act's author, Rep. Wendy McNamara, explained that the Act was a response to

"the public . . . increasingly getting more and more involved in a situation that's really none of their business." Hearing on HB 1186 Before the S. Comm. on Corr. & Crim. L., 123d Gen. Assemb., Reg. Sess. (Ind. Mar. 7, 2023), https://iga.in.gov/session/2023/video/committee_corrections _and_criminal_law_3000/, at 10:05. Violation of the Act is a Class C misdemeanor, *see* Ind. Code § 35-44.1-2-14, punishable by fines of up to $500 and imprisonment for up to 60 days, *see* Ind. Code § 35-50-3-4.

In enacting HB 1186, Indiana lawmakers considered and rejected an amendment that would have made it a defense "that the person would be unable to observe the law enforcement officer executing the officer's duties from a distance greater than twenty-five (25) feet," S. Mot. MO118604, 123d Gen. Assemb., Reg. Sess. (Ind. 2023), https://perma.cc/2SPE-8FRA, as well as an amendment that would have limited the Act to "conduct that would cause a reasonable person to believe that the person intends to interfere with the execution of the officer's duties," S. Mot. MO118606, 123d Gen. Assemb., Reg. Sess. (Ind. 2023), https://perma.cc/P35T-AUYS.

The Act went into effect on July 1, 2023. *See* Ind. Code § 35-44.1-2-14. The Act has since been enforced against members of the public for attempting to film the police. *See* Complaint, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 8, 2023) (alleging that plaintiff was threatened with arrest under the Act while recording officers in South Bend); John Doran, *Woman Arrested Under New Indiana Law for Filming Police Within 25 Feet*, WTHR (Oct. 4, 2023), https://perma.cc/P3SF-VQR2.

## III. The 25-foot law's impact on Appellees and their journalism.

In mid-October 2023, after the Act's effective date, Ryan Thedwall—a photojournalist at WTHR—was called "in the middle of the night to report from the scene of a shooting at a bar involving an off-duty law enforcement officer." Supp. App. 3. Once Thedwall arrived, an officer instructed him "to move back to where other journalists had been crowded into an area roughly the size of a parking space" that, he estimates, was at least 25 feet away from where he had positioned himself. *Id.* The officer did so even though "officers were allowing bystanders who were not working as journalists to get closer to the scene." Supp. App. 4. From that vantage

point, Thedwall's view was obscured; he recalled that "a police car blocked me from having a clear view of what was going on outside the bar."  *Id.*  Although Thedwall wanted "to get a better view of the scene" to better inform the public, he "also didn't want to spend the night in jail" for violating the Act.  *Id.*  As a result, even though Thedwall was "not in law enforcement's way or obstructing their investigation," he moved.  *Id.*

Because Appellees' journalists routinely gather and report the news from within 25 feet of law enforcement, Hums, Director of Content at WTHR, estimates "that a member of the WTHR newsroom is asked to step back or move away from a law enforcement officer as often as once a day." Supp. App. 11.  Journalists employed by Appellees who regularly cover police also are often told to move to a "media staging area," which is often far from the scene.  Supp. App. 4; *see also* Supp. App. 11–12, 17.  Appellees' reporters have found that being confined to these areas "deprives [them] of the ability to document the scene effectively."  Supp. App. 17; *see also* Supp. App. 4.  And, in their experience, members of the press are told to work from those staging areas "even when members of the public who are not

there as journalists are allowed to get closer," because "law enforcement will single out people . . . that they can see have television cameras and require them to stand further away."  Supp. App. 4.  When Appellees' journalists are not interfering but are asked to retreat regardless—now with the threat of arrest and prosecution under the Act—they do so at the cost of their "access to newsworthy information," Supp. App. 5, and "any images . . . [they] wouldn't be able to capture from that distance," Supp. App. 18.

Appellees' journalists have repeatedly expressed concerns to their editors and management that they will be unable to comply with the Act in practice.  When the Act first passed, for instance, IndyStar's Robert Scheer and his colleagues "attempted to guess how far 25 feet was without measuring"—but, as he recalls, "[n]o one was able to estimate that distance correctly," and "25 feet was farther away than any of us had estimated." Supp. App. 16–17; *see also* Supp. App. 29.  WTHR's Hums repeatedly has been "asked [] for guidance" from reporters he supervises about complying with the Act, and has found it "challenging to give journalists workable guidance on how to estimate twenty-five feet when out in the field, what to

do if an officer walks towards you after asking you to step back, what to do if you don't have enough space to back up, and what to do when officers give conflicting orders." Supp. App. 11. Appellees' journalists now go about their work "conscious of the risk" of not only uncertain but also potentially unavoidable criminal liability under the Act, Supp. App. 18, because they often report from situations "where it would be virtually impossible . . . to comply" with an order to move at least 25 feet away from an officer, including in confined spaces and at scenes with agitated crowds, *id.*, "when law enforcement officers are stationed throughout a large crowd" such that reporters cannot "move at least 25 feet away from one officer without ending up within 25 feet of another officer," Supp. App. 6, or when different officers present "give contradictory guidance," *id.*

Because of the obstacles the Act poses to working journalists in Indiana, those Appellees whose mission it is to defend the newsgathering and publication rights of the press have redirected resources to address its effects. For instance, the Reporters Committee for Freedom of the Press ("Reporters Committee") regularly conducts trainings and publishes legal

resources to inform journalists of their rights and aid them in complying with relevant laws. *See, e.g.*, Reporters Comm. for Freedom of the Press, Police, Protesters, and the Press (Mar. 2024), https://www.rcfp.org/resources/police-protesters-and-the-press/; *Trainings*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/trainings/ (last visited Feb. 10, 2025). The Reporters Committee has published new material to educate journalists about the Act,[4] *see* Supp. App. 33, updated its existing resources to address the Act's impact on newsgathering in Indiana, *see id.*, and intends to conduct trainings for journalists and newsrooms operating in Indiana to address the Act's consequences for reporters in the state, *id.*

In addition, as a result of the Act, Reporters Committee attorneys anticipated an increased need for legal advice and representation for journalists working in Indiana. In jurisdictions with similar laws, the Reporters Committee has observed an increase in arrests of individuals documenting law enforcement. In Miami Beach, for instance, enforcement

---

[4] *See, e.g.*, Emily Hockett, *Efforts to Criminalize 'Encroachment' on Police Encroach on First Amendment Rights*, Reporters Comm. for Freedom of the Press (June 26, 2023), https://perma.cc/8S68-9L22.

of a similar—but narrower—ordinance was suspended less than three months after its enactment because arrest data showed that the majority of arrests carried out under the ordinance "were of people who'd been using their phones to record officers."  Martin Vassolo & David Ovalle, *Miami Beach Suspends Law Used by Cops to Arrest People Who Film Them. Training Ordered*, Miami Herald (Aug. 20, 2021), https://bit.ly/3sGpzgF.

In the past, the Reporters Committee has seen an increase in calls to its legal hotline, *see Legal Hotline*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/legal-hotline/ (last visited Feb. 10, 2025), whenever newsworthy events bring journalists into close contact with law enforcement officers, *see* Supp. App. 33–34.  The Reporters Committee anticipates increased use of its hotline by Indiana journalists due to the risks created by the Act.  *See* Supp. App. 34.  For much the same reason, the Reporters Committee has assigned staff attorneys to address additional legal needs created by the Act—including this action.  *See* Supp. App. 33.

## IV.  Appellees' lawsuit and the District Court's injunction.

On October 6, 2023, Appellees filed this action in the U.S. District Court for the Southern District of Indiana against Indiana Attorney General Todd Rokita, Marion County Prosecutor Ryan Mears, and Marion County Sheriff Kerry Forestal, challenging the Act's constitutionality  *See* Dkt. 1. Specifically, Appellees alleged that the Act is void for vagueness and that it violates the First Amendment, both on its face and as applied to Appellees' peaceful, nonobstructive newsgathering in public.  *See* Dkt. 1 (Compl.) ¶¶ 64–86.  Appellants moved to dismiss, arguing that Appellees were not injured by the law because officers, notwithstanding the Act's text, would enforce it "only when necessary to prevent interference with necessary law enforcement activity," SA10–11.[5]  Appellees moved for a preliminary injunction restraining Appellants from enforcing the Act against them.

On September 27, 2024, the District Court issued the decision under review, denying Appellants' motion to dismiss and granting Appellees'

---

[5]     Appellants also argued that Appellees were collaterally estopped by the judgment that Appellants believed would be entered in their favor in a facial First Amendment challenge to the Act brought by an unrelated third

motion for a preliminary injunction.  *See* SA4.  On standing, the District

Court found that "Plaintiffs have produced evidence that their journalists

have been asked to move back by law enforcement officers while gathering

news" since the Act was adopted, "thus establishing that their fear of

enforcement is well-founded."  SA11.  The District Court rejected the

argument that the Act would only be enforced when necessary to prevent

interference with official duties, *see* SA10–11, noting that "[t]he threat of

enforcement 'is latent in the existence of the statute,'" SA11 (quoting *Majors*

*v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)), that "Plaintiffs have received no

assurances that the law will not be enforced against them," *id.*, and that

"[i]t is difficult to fathom how such an assurance of 'deferential'

---

party, in a case that had not, at that point, been decided yet.  *See* Opening
Br. for Defs.-Appellants at 7.  That matter, *Nicodemus v. City of South Bend*,
711 F. Supp. 3d 1015 (N.D. Ind. 2024), is currently on appeal to this Court,
*see Nicodemus v. City of South Bend*, No. 24-1099 (7th Cir. Jan. 23, 2024),
where the matter has been briefed and argued but remains pending as of
the filing of this brief.  The District Court concluded that the *Nicodemus*
proceeding did not provide a basis for staying or dismissing this action
because Nicodemus, a third party unrelated to Appellees, "did not bring a
vagueness challenge to the law, nor could he have argued that the Buffer
Law is unconstitutional as applied to Plaintiffs in this case."  SA16–17.

enforcement can even be made, given the number of law enforcement departments—let alone individual officers—in Indiana," *id.* The District Court also found that the Reporters Committee had established a diversion-of-resources injury sufficient to show organizational standing under *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). SA 15.

On the merits, the District Court found that Appellees were likely to succeed in demonstrating that the Act is void for vagueness in two respects, because it fails to "define an offense '(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'" SA20 (quoting *Bell*, 697 F.3d at 461). As to fair notice, applying this Court's decision in *Bell*, the District Court found that the Act provides no "warning about the behavior that prompts a lawful dispersal order," *Bell*, 697 F.3d at 462, because an officer can "order an individual to withdraw for any reason (or no reason)," SA20 (citation omitted). As the District Court noted, "[s]imply being within twenty-five feet of a police officer is not a crime, and indeed, important First

Amendment rights are regularly exercised within twenty-five feet of law enforcement every single day," SA21, but the Act does not explain when the public should expect their presence to trigger an order backed by criminal penalties, and when they will instead be permitted to approach, *id.*

In the alternative, the District Court held that the Act is unconstitutionally vague because it authorizes "discriminatory or arbitrary enforcement." SA22 (quoting *Bell*, 697 F.3d at 462). The District Court emphasized that "[t]here is nothing in the text of the statute" to limit an officer's discretion to issue an order to retreat for any reason or no reason, including "simply because the officer does not want to be recorded, an unacceptable curtailment of First Amendment rights." *Id.* And, again, the District Court underlined that the statute did "nothing to define the predicate behavior that would prompt an order to move back." SA23. The District Court rejected Appellants' argument that the Act's vagueness could be cured by a pair of media-relations policies that Appellants submitted from Marion County and South Bend, pointing out that neither policy "referenc[ed] the [Act]," SA24, that "no locality's policy is binding

on another locality's officers, providing no assurance that the law will be enforced uniformly," *id.*, and that the suggestion officers would "adhere to standards absent from [the Act's] face . . . is the very presumption that the doctrine forbidding unbridled discretion disallows," *id.* (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988)).

Concluding that the remaining preliminary-injunction factors likewise favored Appellees, *see* SA25–28, the District Court issued a preliminary injunction restraining Appellants from enforcing the Act, SA1.

This appeal followed. *See* Opening Br. for Defs.-Appellants at 10.

## STANDARD OF REVIEW

"When reviewing a district court's grant or denial of a preliminary injunction," this Court "review[s] the court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation omitted). "[A]bsent any clear error of fact or an error of law," this Court gives "great deference to the district court's weighing of the relevant factors." *Id.* (citation and internal quotation marks omitted).

## SUMMARY OF ARGUMENT

Whether the lens is the First or Fourteenth Amendment, the statute enjoined here violates the Constitution for much the same reason. Rather than "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order," *Bell*, 697 F.3d at 463, Indiana authorized officers to bar the press and public from approaching for any reason or no reason, under threat of arrest and criminal prosecution— "vest[ing] unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 756.

The result is a statute "indistinguishable from the law [the Supreme Court] held invalid in *Shuttlesworth v. Birmingham*," *Morales*, 527 U.S. at 58–59 (plurality opinion), under which "a person may stand on a public sidewalk . . . only at the whim of any police officer," *Shuttlesworth*, 382 U.S. at 90. No such law is currently in force anywhere in the nation. *See Deep South Today v. Murrill*, No. 3:24-cv-00623 (M.D. La. Jan. 31, 2025), slip op. at 56–58, https://perma.cc/4CRK-57B6 (enjoining Louisiana's copycat statute in a challenge brought by an overlapping media coalition). And despite

Appellants' effort to muddy the waters by adding a newfound standing argument to the battery the District Court already rejected, *see* SA8–15, the Act's harms to Appellees are clear:  The 25-foot law attaches new penalties to First Amendment activities in which they engage every day.  The District Court rightly enjoined its enforcement; this Court should affirm.

## ARGUMENT

### I.     Appellees have standing to challenge the Act.

The basic principles on which the District Court relied in concluding that Appellees demonstrated Article III standing, *see* SA8–15, are undisputed here.  This Court has explained that plaintiffs bringing a pre-enforcement challenge to a statute's constitutionality may prove standing either by showing "an intention to engage in a course of conduct arguably affected by a policy" and "a credible threat the policy will be enforced," *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), or by showing "a chilling effect on [their] speech that is objectively reasonable, and that [they] self-censor[] as a result"—either is independently sufficient, *id.*

Appellees proved both.  First, even though Appellees need not have shown that the Act has already been enforced against them in particular—because "the threat is latent in the existence of the statute," *Majors*, 317 F.3d at 721—they did so, "produc[ing] evidence that their journalists have been asked to move back by law enforcement officers while gathering news" since the Act was adopted, "thus establishing that their fear of enforcement is well-founded."  SA11.  Second, Appellees also produced evidence of "resort[ing] to self-censorship," *Brown v. Kemp*, 86 F.4th 745, 767 (7th Cir. 2023): evidence that their reporters obeyed instructions to move that prevented them from documenting newsworthy events, even where those journalists posed no risk of interference, to avoid "spend[ing] the night in jail," Supp. App. 4.  For good measure, the District Court also found that the Reporters Committee established a diversion-of-resources injury sufficient to demonstrate organizational standing under this Court's decision in *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019), a finding that does not depend on any particular enforcement action.  SA15.

In this Court, Appellants dispute none of those conclusions; they challenge only redressability, arguing that the District Court's injunction does not relieve Appellees' established injuries if Indiana's law criminalizing refusal to leave an emergency incident area, *see* Ind. Code § 35-44.1-4-5, would also apply in some scenarios covered by the Act. But the objection makes little sense. For one, the record in this case makes clear that Appellees' journalists confront orders to move in contexts where only the Act—not the emergency-incident law—applies to their First Amendment activity. The injunction provides effective relief in those contexts, and redressability does not require complete relief; "the ability to effectuate a partial remedy satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (citation and internal quotation marks omitted). But even where the two laws do overlap in part, Appellees are nevertheless injured by the prospect of incurring additional criminal penalties—more fines, more jail time—under the Act in particular.

Start with the two laws' relative scope. The emergency incident statute applies only to a closed list of contexts, *see* Ind. Code § 35-44.1-4-1.5,

but Appellees also produced evidence that their journalists approach within 25 feet of law enforcement officers to gather the news in a broad range of settings that do not fit the statutory definition of "emergency incident," including public assemblies, rallies,[6] and press conferences.[7]  For that matter, the emergency incident law applies only where law enforcement has established a clearly marked "perimeter," Ind. Code § 35-44.1-4-2(1)(B), but the uncontradicted record evidence demonstrates that Appellees' journalists have been ordered to retreat even when—far from establishing a perimeter—law enforcement officers "were allowing bystanders who were not working as journalists to get closer," Supp. App. 4.   Indeed, the Attorney General himself successfully argued to the district court in *Nicodemus v. City of South Bend*, 711 F. Supp. 3d 1015 (N.D. Ind. 2024), that the Act differs from the emergency incident law because "[n]ot all of what an officer lawfully does will involve a set perimeter," *id.* at 1024. This Court should not humor Appellants' effort to use "intentional self-

---

[6]     *See* Supp. App. 24.
[7]     *See* Supp. App. 2, 9.

contradiction . . . as a means of obtaining unfair advantage" in this litigation. *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (citation omitted).

In any event, even if the laws were jot for jot identical the overlap would not defeat redressability. Violating the Act comes with its own independent penalties, including additional fines and additional jail time. *See* Ind. Code § 35-44.1-2-14. Reducing the penalties associated with a course of conduct provides at least partial relief even if other penalties remain. *See Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024) (redressability satisfied where injunction would reduce chilling effect of "steep penalties" for "still-unlawful acts"). And this case therefore bears no resemblance to the only two cases on which Appellants rely for their redressability argument. In *California v. Texas*, 593 U.S. 659 (2021), the Supreme Court refused to consider a challenge to a provision of the Affordable Care Act when the plaintiffs' asserted injuries were traceable *wholly* to other statutory provisions. In other words, not only would the plaintiffs have remained somewhat injured if their requested relief were granted, they would have obtained no relief at all. *See id.* at 678–80.

Similarly, in *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW v. Johnson*, 674 F.2d 1195 (7th Cir. 1982), the plaintiffs sought benefits for which they were "independently ineligible" under two sources of law, such that they would have been left with exactly the same benefits—none—if their requested relief were granted, *id.* at 1199.  Here, by comparison, the Act's penalties are additive relative to background Indiana law.  Even where both statutes apply, Appellees suffer additional injury because of the Act, and suffer less under the injunction.  That "partial remedy" adequately "satisfies the redressability requirement."  *Uzuegbunam*, 592 U.S. at 291.

To return to common sense:  Indiana has attached new criminal penalties to First Amendment activity that Appellees' journalists engage in every day.  The result is both "a credible threat the policy will be enforced" against them, *Speech First, Inc.*, 968 F.3d at 638, as indeed it already has, and "a chilling effect" on constitutionally protected newsgathering, *id.*  The District Court's injunction redresses both harms.  This Court should affirm.

## II.    The Act is void for vagueness under the Due Process Clause.

On the merits, the District Court correctly concluded that the Act is void for vagueness twice over, finding that it fails to "define an offense '(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'"  SA20 (quoting *Bell*, 697 F.3d at 461). Both holdings should be affirmed.  Under the statute, officers may order any of the countless individuals who pass within 25 feet of an officer each day to retreat for any reason or for no reason.  And under the on-point precedent of this Court and the Supreme Court, both of which already speak directly to the vagueness standards that govern dispersal-order statutes like the Act, the law calls for classically "standardless decision-making and enforcement at odds with due process."  *Bell*, 697 F.3d at 463.

A.    The Act delegates arbitrary discretion to law enforcement officers to decide which of the countless individuals who approach within 25 feet should be ordered to retreat.

As the parties agree, *see* Opening Br. for Defs.-Appellants at 11, a criminal statute is void for vagueness if the law is "so standardless that it

invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The Act is such a statute, "indistinguishable from the law [the Supreme Court] held invalid in *Shuttlesworth v. Birmingham*" because it permits officers "to decide arbitrarily which members of the public they will order to disperse." *Morales*, 527 U.S. at 58–59 (plurality opinion). And this Court, too, could hardly have spoken more clearly: If a dispersal-order statute does not "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order," it "permits law enforcement too much discretion" in violation of due process. *Bell*, 697 F.3d at 463. In the teeth of those authorities, Appellants—rather than dispute the District Court's reading of the Act, or search its text for a standard that would guide officers in deciding who should be ordered to retreat—opt to argue it need not contain one. The Supreme Court and this Court have foreclosed that position; the District Court was right to reject it.

In arguing otherwise, Appellants open by emphasizing that this defect poses a facial challenge to the Act, but that much is always true of a claim that a statute is "standardless." *Planned Parenthood of Ind. & Ky., Inc.*

*v. Marion Cnty. Prosecutor*, 7 F.4th 594, 603 (7th Cir. 2021) (noting that the

Supreme Court has "on a number of occasions" entertained facial

challenges on that footing (citation omitted)). "At least in a pre-

enforcement posture, such a claim is by its nature facial," *Act Now to Stop*

*War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir.

2017), because the statute's plain text either does or does not contain

"minimal guidelines to govern law enforcement," *Morales*, 527 U.S. at 60

(majority opinion) (citation omitted).[8]  In other words, "[t]he ordinance is

unconstitutional, not because a policeman applied this discretion wisely or

poorly in a particular case, but rather because the policeman enjoys too

much discretion in *every* case." *Id.* at 71 (Breyer, J., concurring in part and

---

[8]     Tellingly, Appellants rely exclusively on case law favoring as-applied
challenges where alleged vagueness stems from *linguistic* "ambiguity in the
Statute." *Planned Parenthood of Ind. & Ky.*, 7 F.4th at 604.  But the Supreme
Court has always distinguished cases of linguistic ambiguity, where the
law's text "appl[ies] without question to certain activities, but [its]
application to other behavior is uncertain," from statutes that simply fail to
provide "any ascertainable standard" for enforcement.  *Smith v. Goguen*,
415 U.S. 566, 578 (1974).  The latter may be 'clear' in a colloquial sense—a
law reading 'do what any police officer tells you to do' is not linguistically
ambiguous—but they are vague on their face for purposes of due process,
because the lack of a guiding standard "affects all who are prosecuted," *id.*

concurring in the judgment).  And the Supreme Court has made clear that facial challenges are favored, not discouraged, where a public official's arbitrary discretion is at issue, because the "[s]elf-censorship" threatened by unbridled discretion "is immune to an 'as applied' challenge."  *City of Lakewood*, 486 U.S. at 757; *see also Thornhill v. Alabama*, 310 U.S. 88, 97–98 (1940) (same with respect to a vague criminal statute in particular).

For purposes of determining whether a statute's text, on its face, contains "minimal guidelines to govern law enforcement," *Kolender*, 461 U.S. at 358 (citation omitted), the Supreme Court's decision in *Morales* is directly on point.  There, the Court dealt with a dispersal-order ordinance that permitted officers to issue orders where two or more persons— including at least one whom officers reasonably believed to be a gang member—were seen "remain[ing] in any one place with no apparent purpose."  *Morales*, 527 U.S. at 47–48 (majority opinion) (citation omitted). Chicago argued that the law in fact contained three objective limits:  It did not "apply to people who are moving," *id.* at 61 (majority opinion), it did "not permit an arrest if individuals obey a dispersal order," *id.*, and it did

not apply "unless the officer reasonably believes that one of the loiterers is a member of a criminal street gang," *id.* But the Court found "each of these limitations insufficient" on grounds that likewise doom the Act. *Id.*

The second of Chicago's unsuccessful arguments—that the order requirement itself limits officers' discretion—is identical to Appellants' principal defense of Indiana's 25-foot law. *See* Opening Br. for Defs.-Appellants at 30–31 ("The law only criminalizes knowingly encroaching within that 25-foot zone *after* an officer gives a do-not-approach order."). And *Morales* already held that Appellants' logic is circular: The Act "does not provide any guidance to the officer deciding whether such an order should issue" in the first place. 527 U.S. at 62 (majority opinion). Where a statute fails to explain when an officer should order individuals to move, "the move-on provision could not cure—and might well compound—its enforcement-discretion defect." *Agnew v. Gov't of Dist. of Columbia*, 920 F.3d 49, 60 (D.C. Cir. 2019). In other words, the Due Process Clause requires that the Act "curtail[] law enforcement's dispersal authority," not merely the power to make arrests if an order is not followed. *Bell*, 697 F.3d at 463.

For much the same reason, Appellants' repeated references to *mens rea*—by which they mean the fact that the statute requires 'knowing' failure to comply with a retreat order, not an intent to cause some proscribable harm—get them nowhere. If officers enjoy arbitrary discretion to issue the order, "[a] person's knowing failure to obey such an order could do nothing either to cure the officer's lawless discretion or to establish the individual's culpability." *Agnew*, 920 F.3d at 60; *see also Brown*, 86 F.4th at 775 (noting that an "intent element does nothing to eliminate or reduce vagueness issues with the conduct elements of criminal statutes").

*Morales* likewise makes clear why Appellants' reliance on the observation that the Act applies only within 25 feet, or only when officers are on duty, *see* Opening Br. for Defs.-Appellants at 23–24, does nothing to supply the missing enforcement standard. True enough, an officer does not have latitude to issue a lawful order to someone 26 feet away or while the officer is at home—but just as Chicago's insistence that officers could not issue orders to people who were moving "[did] not even address the question of how much discretion the police enjoy in deciding which

stationary persons to disperse," the Act's arbitrary 25-foot bubble still grants officers standardless discretion within that bubble. *Morales*, 527 U.S. at 61–62 (majority opinion). The question asked by the vagueness inquiry is not whether the statute contains *any* bounds—a law that read "do what any police officer tells you to do" would not be less vague if it applied only on Tuesdays—but whether those limits guide officers in distinguishing "innocent conduct," *id.* at 60, from conduct with the "harmful purpose or effect" the legislature intended to address, *id.* at 62. The law must "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order," *Bell*, 697 F.3d at 463, but the Act fails to do so.

None of the "objective standards" Appellants point to provide that guidance, Opening Br. for Defs.-Appellants at 23, because the Act's sweep is defined entirely in terms of "harmless conduct," *Morales*, 527 U.S. at 63 (majority opinion). After all, Appellants themselves agree that the Act was not intended to discourage mere presence within 25 feet of a law enforcement officer performing his or her duties. *See* Opening Br. for Defs.-Appellants at 28 ("[I]t is not a crime to be within 25 feet of an officer.").

And yet Appellants make clear that they do not read the Act to limit an officer's discretion to issue a retreat order to circumstances that in fact pose some non-zero risk of interference, *see id.* at 21 ("A 'do not approach' order is legitimate under the Buffer Law whenever an officer is conducting his or her official duties."). That failure to "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order" is, under this Court's precedent, textbook arbitrary discretion. *Bell*, 697 F.3d at 463.

For much the same reason, it makes no sense for Appellants to maintain that the Act is less vague than the statutes in *Morales* or *Bell* because this statute—in lieu of a "subjective standard" like "serious inconvenience" for deciding who to disperse—has no standard at all. Opening Br. for Defs.-Appellants at 27. That brings this case even closer to *Shuttlesworth*. There is nothing subjective about whether a person is "stand[ing] on a public sidewalk," *Shuttlesworth*, 382 U.S. at 90, but a law that authorizes police to disperse *anyone* standing on a public sidewalk extends extraordinary enforcement discretion to law enforcement—so much so that its unconstitutionality "needs no demonstration," *id.* Here

too, an officer must make the (subjective) decision whether some, all, or none of the vast number of individuals who pass within 25 feet should be ordered to retreat, and the statute provides no guidelines—not even "minimal guidelines," *Kolender*, 461 U.S. at 358—for making that call.

As a final fallback position, Appellants argue that the Act's vagueness can be cured by reference to the policies that law enforcement agencies opt at their sole discretion to adopt. The most obvious problem with that argument is that neither of the policies Appellants point to so much as reference the Act, so they can hardly be viewed as providing a "binding judicial or administrative construction" of it. *City of Lakewood*, 486 U.S. at 770. The point is only made starker by the reality, as the District Court observed, that Appellants produced the policies of just "two jurisdictions" when the Act can be enforced by any law enforcement officer in Indiana. SA24–25. *Compare, e.g.*, *Brown*, 86 F.4th at 768 (nonbinding guidance of a single agency irrelevant where "district attorneys in every county" and "Sheriffs' deputies all over the state" could likewise enforce

the law), *with Planned Parenthood of Ind. & Ky.*, 7 F.4th at 606 (considering

guidance of the state agency authorized to "formally interpret the law").

More fundamentally, though, the point of vagueness doctrine is that

a law enforcement agency's own discretionary decisions are no substitute

for "the requirement that *a legislature* establish minimal guidelines to

govern law enforcement."  *Kolender*, 461 U.S. at 358 (emphasis added)

(citation omitted).  For just that reason, the Supreme Court in *Morales*

"refused to accept the general order issued by the police department as a

sufficient limitation on the vast amount of discretion granted to the police"

by the challenged ordinance.  *Morales*, 527 U.S. at 63 (majority opinion)

(internal quotation marks omitted).  That rule controls here.  Because the

Act provides no "guidance to the officer deciding whether such an order

should issue" in the first place, *id.* at 62, the statute is vague on its face.

> B.      The Act fails to provide members of the public and the press
>         <u>fair warning of the conduct that will prompt an order to retreat</u>.

Even setting aside the Act's failure to limit the discretion of law

enforcement, the District Court rightly concluded that the Act would be

independently void for vagueness because it fails to provide "'warning

about the behavior' that will prompt" a lawful dispersal order.  SA20

(quoting *Bell*, 697 F.3d at 462); *accord Deep South Today*, No. 3:24-cv-00623,

slip op. at 50 (identical Louisiana law fails to provide fair notice, in

violation of Due Process Clause, because "any person, at any time,

partaking in any activity (or engaging in no activity) near law enforcement

may be given an order to retreat, which places them in danger of arrest or

prosecution").  In response, Appellants argue that the order itself is notice

enough—that any "problem [that] is created by a law that criminalizes

conduct people normally believe to be innocent is solved when persons

receive actual notice from a police order of what they are expected to do."

*Morales*, 527 U.S. at 58 (plurality opinion).  But the Supreme Court rejected

that argument in *Morales*, and this Court likewise shut the door to it in *Bell*.

As *Morales* explained, "[b]ecause an officer may issue an order only

after prohibited conduct has already occurred, it cannot provide the kind of

advance notice that will protect the putative loiterer from being ordered to

disperse."  527 U.S. at 59 (plurality opinion).  Or in other words, where the

public does not know what will prompt an officer to issue an order in the

first place, "an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible." *Id.*; *see also id.* at 69 ("The predicate of an order to disperse is not, in my view, sufficient to eliminate doubts regarding the adequacy of notice under this ordinance." (Kennedy, J., concurring in part and concurring in the judgment)). Otherwise, on Appellants' theory, a statute that read 'do what any police officer tells you to do' would provide fair notice despite reducing the public's legal obligations to pure, unpredictable discretion. *But see id.* at 58 (if an individual's conduct "is in fact harmless and innocent, the dispersal order itself is an unjustified impairment of liberty" (plurality opinion)).

If *Morales* left any doubt on that front, *Bell* resolved it. There, this Court dealt with a vagueness challenge to a Chicago ordinance that punished failure "to obey a lawful order of dispersal" by a law enforcement officer "where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm." *Bell*, 697 F.3d at 450 (quoting Chi. Mun. Code § 8-4-010(d)). On Appellants' theory,

that ordinance should have been immune to a fair-notice challenge because "[a]n ordinary citizen may conform his or her conduct to the law by obeying." Opening Br. for Defs.-Appellants at 26. But this Court held that the statute must provide "warning about the behavior that *prompts* a lawful dispersal order," *Bell*, 697 F.3d at 462 (emphasis added), not just notice of what to do after an order has been received, *see also id.* (due process requires notice of what "conduct may legitimately invite a dispersal order), and concluded that Chicago's dispersal-order ordinance failed to do so.

The Act likewise falls short. As already canvassed above, lawmakers told neither officers nor the public which of the countless individuals who come within 25 feet of an officer each day, for innocent purposes and to exercise "important First Amendment rights," should be ordered to retreat on pain of arrest and criminal prosecution. SA21. And as a result, whether Appellees' journalists will receive an order to retreat the next time they approach is a pure roll of the dice. That problem permeates every application of the Act, which is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible

normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

Appellants' own brief illustrates the confusion. They insist on the one hand that the public should "stay 25 feet away from any police officer engaged in official conduct" at all times if they want to avoid arrest, Opening Br. for Defs.-Appellants at 22, while maintaining on the other that "it is not a crime to be within 25 feet of an officer," *id.* at 28. Those statements cannot both be the law of Indiana. If the state's own officials cannot identify the conduct the Act proscribes, citizens likewise lack fair "warning about the behavior that prompts a lawful dispersal order." *Bell*, 697 F.3d at 462. On that ground, too, the District Court correctly found the Act unconstitutionally vague on its face—even without reference to the Act's First Amendment harms. *See Planned Parenthood of Ind. & Ky.*, 7 F.4th at 606 (stricter vagueness review applies to law that also risks "chill[ing] a protected constitutional right"). That holding should be affirmed.

## III.  The Act violates the First Amendment.

Because the Act's vagueness sufficed to justify the preliminary injunction, the District Court found no need to address the statute's constitutionality (or not) under the First Amendment.  *See* SA19.  But this Court can "affirm on any ground that has a basis in the record," *Anderson*, 274 F.3d at 478, and the record in this case likewise makes clear that the Act poses an "ever-present potential for arbitrarily suppressing First Amendment liberties," *Shuttlesworth*, 382 U.S. at 91; *see also Deep South Today*, No. 3:24-cv-00623, slip op. at 39 (media coalition stated successful as-applied First Amendment challenge to Louisiana's identical law because the statute "contains no limiting provisions to attempt to burden a smaller amount or degree of expressive conduct or speech").  Those harms to the freedoms of speech and of the press would provide an independent basis to affirm the preliminary injunction, whether this Court reviews the statute on its face or as applied to the lawful newsgathering that Appellees' journalists carry out within 25 feet of law enforcement officers every day.

A.    The Act violates the First Amendment as applied to Appellees' peaceful, nonobstructive newsgathering in public places.

When Appellees' journalists "knowingly or intentionally approach[]" within 25 feet of law enforcement officers, Ind. Code § 35-44.1-2-14, they engage in activity protected by the First Amendment.  As this Court recently explained in *Brown*, because "the First Amendment protects conduct and activities necessary for expression," it likewise protects "approaching" a newsworthy event in order "to carry out plaintiffs' protected monitoring and recording," 86 F.4th at 779;[9] *see also, e.g.*, *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (applying First Amendment scrutiny to "officers' directives to keep moving").  And as the Tenth Circuit observed in the context of policing in particular, "since the First Amendment protects the right to criticize police, then *a fortiori* it protects the right to remain in the area to be able to criticize the observable

---

[9]    A different provision of the statute in *Brown* prohibited recording as such, but this Court separately asked whether "the acts listed in clause (c)—photographing and otherwise recording," and the activities addressed by "the other clauses" of the statute, including the standalone clause that prohibited "approaching," were constitutionally protected.  86 F.4th at 779.

police conduct," because if "police could stop criticism or filming by asking onlookers to leave," officers could "bypass the Constitution." *Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (citation omitted). That is, of course, what the Act was designed to enable—a First Amendment end run.

The Constitution is not that easily foiled. Though the Act would fail any degree of First Amendment scrutiny, it triggers strict scrutiny because the statute is content based twice over. For one, "[t]o qualify as content-neutral," a law "cannot invest unbridled discretion" that can be used to discriminate on the basis of content. *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (citation and internal quotation marks omitted); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992). Here, as the District Court found in the context of vagueness, the statute is utterly standardless—it empowers law enforcement officers to order Appellees' journalists to retreat "simply because the officer does not want to be recorded." SA22. That failure to supply a content-neutral enforcement standard triggers strict scrutiny.

If that weren't enough, the Act is also content based in its "evident purpose." *Brown*, 86 F.4th at 782. This Court's decision in *Brown* controls on that question. There, this Court considered a strikingly similar First Amendment challenge to a ban on, *inter alia*, "approaching" hunters. *Id.* at 779. As the Court observed, the challenged statute did not require that an individual's presence in fact obstruct hunting; indeed, preexisting Wisconsin law "already encompassed physical interference with hunters." *Id.* at 782. As a result, the law's "only evident purpose was to expand the statute to reach expressive activity," targeting that "signal[ed] an improper purpose," and triggered strict scrutiny. *Id.* Here, the statutory context makes the same point clear. Indiana has already criminalized conduct that knowingly "interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties," Ind. Code § 35-44.1-3-1(a)(1), which leaves the Act with nothing to do—nothing, that is, but empower officers to "stop criticism or filming by asking onlookers to leave." *Jordan*, 73 F.4th at 1170. As a transparent bid to circumvent the First Amendment right to document law

enforcement officers carrying out official duties, *see Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012), the Act is content based.

To be clear, though, even if the Act could be construed as a time, place, or manner restriction, or as a law that also regulates conduct,[10] it could not survive intermediate scrutiny either.  *See Deep South Today*, No. 3:24-cv-00623, slip op. at 38–40 (identical Louisiana law would fail intermediate scrutiny).  Even content-neutral restrictions on newsgathering must be "narrowly tailored to serve a significant government interest," *Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017), and must leave open "alternative observation opportunities" to document the event, *id.* at 1212.  Or as this Court put it in the context of dispersal orders in particular, "when individuals ordered to disperse or move along manifest a 'bona fide

_____

[10]     As this Court has observed, the distinction between laws "enacted to regulate conduct" but that "could be seen as having the incidental effect of burdening speech" and laws "regulat[ing] the time, place, and manner of speech" has "no real effect on the outcome of the case."  *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004).  In either event, the statute faces intermediate scrutiny.  *See Goldhamer v. Nagode*, 611 F. Supp. 2d 784, 791 (N.D. Ill. 2009), *vacated on other grounds*, *Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) (same in the context of a dispersal-order statute).

intention to exercise a constitutional right,'" the government's interests "prevail[] only if the nuisances at issue risk substantial harm or if dispersal is otherwise necessary to address the violations and transgressors." *Bell*, 697 F.3d at 459 (quoting *Colten v. Kentucky*, 407 U.S. 104, 111 (1972)). The burden of demonstrating as much rests with Appellants, *see Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (even at the preliminary-injunction stage, government "bears the burden of justifying the regulatory scheme"), but Appellants never carried it in this case.

Start with narrow tailoring. A law that "condition[s] the free exercise of First Amendment rights on the 'unbridled discretion' of government officials" is never narrowly tailored, even under intermediate scrutiny. *Gaudiya Vaishnava Soc'y v. City & Cnty. of San Francisco*, 952 F.2d 1059, 1065 (9th Cir. 1990) (quoting *City of Lakewood*, 486 U.S. at 755). And intuitively so: While Appellants rattle off a number of scenarios in which they imagine the Act might be useful, *see* Opening Br. for Defs.-Appellants at 1, there is nothing in the Act's text to channel an officer's arbitrary discretion towards any of those interests—no reference to safety, to traffic, to

emergencies, or to any other government interest that Appellants might assert. And as a result, "[e]xamples of how the Act could be less restrictive while still achieving the governmental interests abound," including by incorporating a requirement that individuals either intend to obstruct or in fact obstruct officers' duties. *Deep South Today*, No. 3:24-cv-00623, slip op. at 39. Because the Act fails to specify that "dispersal must be necessary to confront the violation . . . , the ordinance lacks the necessary specificity and tailoring to pass constitutional muster," *Bell*, 697 F.3d at 459, chilling reporting that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them," *Alvarez*, 679 F.3d at 606.

Neither could Appellants imaginably establish that "each activity within the [Act's] scope is an appropriately targeted evil," *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)—that is, that an individual's presence within 25 feet *always* threatens the harm the Act was designed to address, whether or not there is any nexus to a legitimate government interest. For one, to Appellees' knowledge, every federal court of appeals to address the

53

question of 'how close is too close' when documenting law enforcement activity has concluded—absent some independent act of obstruction or interference—that the First Amendment protects the right to be as close as a few feet away.[11]  And again, Appellants themselves admit that "it is not a crime to be within 25 feet of an officer," Opening Br. for Defs.-Appellants at 28, and assert that they envision the Act being enforced only in a vanishingly small number of the applications that the statute authorizes on its face.  That argument puts the lie to the suggestion that any meaningful proportion of the countless individuals who pass within 25 feet of an officer each day in fact "require[] officers to divert their attention."  *Id.*

In a passing parenthetical, Appellants advert to the alternative explanation they offered for the Act's scope in the District Court—that

---

[11]     *See Glik v. Cunniffe*, 655 F.3d 78, 80 (1st Cir. 2011) (individual filming from "roughly ten feet away" was at "a comfortable remove," *id.* at 84 (citation omitted)); *Perkins v. Hart*, No. 22-30456, 2023 WL 8274477, at *7 (5th Cir. Nov. 30, 2023); *see also* Richard A. Webster, *Video of Mother's Arrest Raises Questions About 25-Foot Buffer Law*, La. Illuminator (June 9, 2023), https://perma.cc/L4TC-YADT (noting that the prevailing plaintiff in *Perkins* was six feet from officers, and that the defendants in that case had unsuccessfully urged the Fifth Circuit to approve a 21-foot buffer instead).

unspecified "'studies . . . have shown that an armed individual within twenty-one feet of an officer still has time to get to the officer' before he can effectively react."  *Id.* at 28–29 (quoting *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 785 (4th Cir. 1998)).  No such studies were made part of the record here; the only evidence Appellants submitted was the declaration of Dr. Richard Celeste, who candidly admitted that he was "uncertain as to how the 25 foot distance was determined," Decl. of Dr. Richard Celeste, Ex. A at 18, *Reporters Comm. for Freedom of the Press v. Rokita*, No. 1:23-cv-1805 (S.D. Ind. Jan. 5, 2024), ECF No. 34-2, but speculated that a bubble was necessary to address the risk of a charging assailant on the basis of unadorned and unexplained block quotes from the memoirs of former police officers, *see id.* at 15–16.  The absence of any reliable record evidence on that issue should be no surprise, because the so-called '21-foot rule' is widely considered "junk science"—including by the Utah police officer who coined the concept.  Kelly McLaughlin, *Police Training Programs Have a Pseudoscience Problem*, Bus. Insider (June 17, 2020), https://perma.cc/6SMX-7UV8; *see also* Christian Sheckler, *South Bend Police Has No Mandatory De-escalation*

*Training, but 7 'Combat Shoots' Each Year*, S. Bend Trib. (July 8, 2020), https://perma.cc/E8N9-ZDKD (describing the 21-foot rule as "discredited").

As other law enforcement officers have explained, the bare insight that an individual can charge a given distance in a given time with a knife is "not relevant" to an officer's decisionmaking "without the known or believed presence of a deadly weapon," and without reason to think "the subject intends to attack a person with that weapon." Dave Brown & Randy LaHaie, *The Myth of the '21-Foot' Rule*, Blue Line (Dec. 28, 2020), https://perma.cc/X2YP-CU86. As a result, police executives across the country have urged agencies to "eliminate from their policies and training all references to the so-called '21-foot rule.'" Police Exec. Rsch. Forum, Guiding Principles on Use of Force at 54 (2016), https://perma.cc/46R9-XE7N. And federal courts, in turn, have concluded that—"[e]ven assuming the rationale for this 21-foot rule is accurate"—it does not provide a lawful basis for treating someone other than "a charging assailant" as a threat. *Teel v. Lozada*, 826 F. App'x 880, 889 (11th Cir. 2020).

Here, of course, Indiana lawmakers deliberately omitted from the Act any consideration of an individual's actual or apparent intent or their actual or apparent threat to officers—leaving the statute untethered from the justifications Appellants offered to support it. Indeed, Appellants have never attempted to explain how sworn officers across the nation perform their duties effectively when Indiana is one of just two states to enact this novel 'bubble'—neither of which is currently in effect because both have been blocked by the federal courts. *See Deep South Today*, No. 3:24-cv-00623, slip op. at 56–67;[12] *see also Randall v. Sorrell*, 548 U.S. 230, 253 (2006) (plurality opinion) (noting that the fact that there are no "comparable limits in other States" represents a "danger sign[]" that a statute "may fall outside tolerable First Amendment limits"). Even intermediate scrutiny would require Appellants to show that Indiana "seriously undertook to address the problem with less intrusive tools readily available to it" and "considered different methods that other jurisdictions have found

---

[12] The only other loose comparator is Florida—but that state's law only prohibits approaching with the *specific intent* to "[i]mpede or interfere with" the performance of an officer's duties. Fla. Stat. § 843.31(2)(a)(1).

effective," *McCullen v. Coakley*, 573 U.S. 464, 494 (2014), including the

"available generic criminal statutes" criminalizing obstruction, *id.* at 492.

The Act cannot clear that hurdle; it reflects no tailoring of any kind.

Finally, even if the statute were otherwise narrowly tailored to a

significant interest, it would need to "leave[] open ample alternative

channels for communication." *Alvarez*, 679 F.3d at 605 (citation omitted).

This Court has stressed that "audio and audiovisual recording are uniquely

reliable and powerful methods of preserving and disseminating news,"

and it is "highly unlikely that other methods could be considered

reasonably adequate substitutes," *id.* at 607. Here, Appellants never

disputed that 25 feet is too great a distance to record audio or conduct

interviews, which would suffice to find that alternative channels are not

available. *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–78

(1997) (noting that 15 feet is beyond "normal conversational distance").

And with respect to images or video, Appellants never offered anything

but *ipse dixit* for the proposition that Appellees' journalism is not

impaired—no basis to gainsay Appellees' experienced reporters on the

limits of their equipment.  *See*  Supp. App. 2; *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) ("Whether an alternative is ample should be considered from the speaker's point of view.").  That failing, too, would suffice to show that the Act is inconsistent with the First Amendment.

In each respect, the Act would fail any degree of scrutiny as applied to Appellees' newsgathering—First Amendment activity that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them," *Alvarez*, 679 F.3d at 606.  That independent basis, too, justifies affirming the District Court's preliminary injunction

B.    The Act violates the First Amendment on its face.

As a final basis for relief, the Act is also facially overbroad under the First Amendment.  This Court provided controlling guidance on First Amendment facial challenges to dispersal-order statutes in *Bell.*  As discussed above, in that case, the plaintiff challenged as facially overbroad a Chicago ordinance that punished failure "to obey a lawful order of dispersal" by a law enforcement officer "where three or more persons are

committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm."  697 F.3d at 450 (quoting Chi. Mun. Code § 8-4-010(d)).  Such a law directly implicates the First Amendment even where the "triggering conduct cannot be an act constituting protected expression," this Court explained, because "once triggered, it may be applied to disperse people engaged in peaceful speech or expressive conduct."  *Id.* at 456–57.  And such a statute survives review for overbreadth only where the power to disperse is limited to circumstances where the triggering conduct "risk[s] substantial harm or if dispersal is otherwise *necessary* to address the violations and transgressors."  *Id.* at 459.  Because the orders in *Bell* could be issued "to individuals exercising protected First Amendment rights" without any showing that an order was in fact "necessary," they "lack[ed] the necessary specificity and tailoring to pass constitutional muster."  *Id.*

Here, the Act is even broader than the ordinance this Court invalidated in *Bell*:  It contains no standard of any kind, not even one as vague as "serious inconvenience," that might limit when an officer may

issue an order to retreat.  On that front, Appellants make much of the fact

that the Act applies only when an officer is "conducting their official

duties."  Opening Br. for Defs.-Appellants at 28.  On its own term,

however, that limits nothing because it sweeps in everything officers do on

the clock.  But more importantly, the Act does not say—and Appellants do

not interpret the Act to say—that an order may issue only when an

individual's conduct in fact *obstructs* (or threatens to obstruct or intends to

obstruct) those official duties.  *See id.*  After all, that harm is already

addressed by Indiana's generic obstruction statute, as the District Court

pointed out, *see* SA27–28, and Indiana lawmakers deliberately rejected an

amendment that would have required a nexus to obstruction, S. Mot.

MO118606, 123d Gen. Assemb., Reg. Sess. (Ind. 2023),

https://perma.cc/P35T-AUYS; *see also* SA22.  Instead, the Act is triggered—

as the parties appear to agree—by the bare fact of presence within 25 feet,

even when an individual's intentions are "completely innocent."  Opening

Br. for Defs.-Appellants at 28, and even when no threat to any government

interest exists, *see id.* at 21 ("A 'do not approach' order is legitimate under

the Buffer Law whenever an officer is conducting his or her official duties.").  Just as in *Bell*, because the Act permits officers to issue retreat orders "to individuals exercising protected First Amendment rights" even when dispersal would not be "necessary," the law "lacks the necessary specificity and tailoring to pass constitutional muster."  697 F.3d at 459.

The same result would follow from first principles even if *Bell* were not controlling.  Setting aside the fact that a restriction on "approaching" officers triggers First Amendment scrutiny under this Court's decision in *Brown*, 86 F.4th at 779, the Supreme Court made clear in *McCullen v. Coakley*, 573 U.S. 464 (2014), that even a law that "says nothing about speech on its face" is "subject to First Amendment scrutiny" if it "restricts access to traditional public fora," *id.* at 476; *see also, e.g.*, *Hodgkins*, 355 F.3d at 1059 (movement restrictions like curfew orders directly regulate First Amendment activity because "[b]eing out in public is a necessary precursor" to virtually all First Amendment activity).  At the very bare minimum, the law unquestionably regulates the 'place' of First Amendment activity—not within 25 feet of an officer—and the Act cannot

survive intermediate (or any degree of) First Amendment scrutiny because, on its face, it "vests unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood*, 486 U.S. at 755–56. For all of the reasons discussed above in connection with Appellees' as-applied claim, that sweep reflects a profound failure of narrow tailoring, and that facial invalidity provides an additional basis for enjoining the enforcement of the Act under the First Amendment.

Here, as they did in the District Court, Appellants attempt to make much of the decision of the Northern District of Indiana in *Nicodemus v. City of South Bend*, 711 F. Supp. 3d 1015 (N.D. Ind. 2024), which rejected a facial overbreadth challenge to the Act. But that decision—currently on appeal to this Court where briefing and argument have recently concluded, *see Nicodemus v. City of South Bend*, No. 24-1099 (7th Cir. Jan. 23, 2024)— provides Appellants no help. Set aside the fact that *Nicodemus* expressly reserved the questions whether the Act is void for vagueness or would violate the First Amendment as applied to newsgathering, *see Nicodemus*, 711 F. Supp. 3d at 1021 & n.4, and therefore does not address either of the

claims discussed above.  Even as to facial overbreadth, the plaintiff in

*Nicodemus* was "focuse[d] on recording," *id.* at 1024, and never argued—as

this Court's precedent holds—that law enforcement orders to move

directly implicate the First Amendment, even when the "triggering

conduct cannot be an act constituting protected expression," *Bell*, 697 F.3d

at 456–57.  Indeed, the plaintiff in *Nicodemus* never drew the district court's

attention to *Bell*, which expressly governs when a plaintiff challenges as

overbroad a law that "criminalize[s] their refusal" to move when "ordered

to disperse or move along," *id.* at 459 (citing *Colten*, 407 U.S. at 111).  As a

result *Nicodemus* never addressed, let alone distinguished, *Bell*.   While the

Northern District of Indiana understandably resolved the case as the

parties had briefed it, *Nicodemus* has little persuasive value here.

Ultimately, the First Amendment complements what the Due Process

Clause already makes clear:  A statute that "says that a person may stand

on a public sidewalk . . . only at the whim of any police officer" violates the

Constitution, *Shuttlesworth*, 382 U.S. at 90, whether because it provides for

"government by the moment-to-moment opinions of a policeman on his

beat," *id.* (citation omitted), or because of "its ever-present potential for arbitrarily suppressing First Amendment liberties," *id.* at 91.  The Act poses just that danger—including to the newsgathering Appellees carry out within 25 feet of police officers every day.  Recognizing as much, the District Court rightly enjoined its enforcement.  This Court should affirm.

## CONCLUSION

For the reasons herein and in the District Court's opinion, Appellees respectfully urge this Court to affirm the preliminary injunction.

Date: February 12, 2025

/s/ Grayson Clary
Grayson Clary
*Counsel of Record for*
   *Plaintiffs-Appellees*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-931

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 32(c) because it contains 12,279 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Cir. R. 32(b) and Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it is set in 14-point Palatino Linotype, a proportionally spaced typeface, and was prepared using Microsoft Word for Mac (version 16.78).

Date: February 12, 2025

*/s/ Grayson Clary*
Grayson Clary
*Counsel of Record for*
  *Plaintiffs-Appellees*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

**CERTIFICATE OF SERVICE**

I, Grayson Clary, do hereby certify that I have filed the foregoing

Answering Brief for Plaintiffs-Appellees electronically with the Clerk of the

Court for the United States Court of Appeals for the Seventh Circuit using

the appellate CM/ECF system on February 12, 2025.

I certify that all participants in this case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.

Date: February 12, 2025         */s/ Grayson Clary*
                                    Grayson Clary
                                    *Counsel of Record for*
                                      *Plaintiffs-Appellees*
                                    REPORTERS COMMITTEE
                                      FOR FREEDOM OF THE PRESS