No. 24-2927

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, *et al.*,

*Plaintiffs-Appellees*,

v.

TODD ROKITA, RYAN MEARS *and* KERRY FORESTAL,
*in their official capacities*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the
Southern District of Indiana
Case No. 1:23-cv-1805 (Hon. James R. Sweeney, II)

**SUPPLEMENTAL APPENDIX FOR PLAINTIFFS-APPELLEES**

Grayson Clary
*Counsel of Record for*
  *Plaintiffs-Appellees*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

# TABLE OF CONTENTS

**Page:**

ECF No. 27-1 – Declaration of Ryan Thedwall.............................Supp. App. 1

ECF No. 27-2 – Declaration of Scott Hums ...................................Supp. App. 8

ECF No. 27-3 – Declaration of Robert Scheer .............................Supp. App. 14

ECF No. 27-4 – Declaration of Rex Smith....................................Supp. App. 26

ECF No. 27-5 – Declaration of Lisa Zycherman .........................Supp. App. 31

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANAPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805-JRS-MG |
| *Plaintiffs,* | |
| v. | |
| TODD ROKITA, *in his official capacity as Attorney General of Indiana, and* RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff,* | |
| *Defendants.* | |

**DECLARATION OF RYAN THEDWALL**

I, Ryan Thedwall, declare as follows:

1.     I am over the age of 18.  I make this declaration in support of

Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.  I have

personal knowledge of the matters stated herein.

**Supp. App. 1**

2.     I am a photojournalist at WTHR in Indianapolis, Indiana, a broadcast television station owned by TEGNA, Inc.  I have been employed, full-time, as a photojournalist at WTHR-TV for more than a decade.  Before joining WTHR-TV, I worked as a photojournalist at WNDU, a television station in South Bend, Indiana, and in freelance television production.

3.     At WTHR, I work with both the investigative team and on general assignment. When I am on general assignment, I cover breaking news around Indianapolis, which often brings me into contact with law enforcement officers.

4.     In a typical work week, I usually come into contact with law enforcement officers on the job three or four times. That can include, for example, when I am covering crime scenes or other breaking news events, press conferences, or events, like football games, that draw large crowds.

5.     When covering newsworthy events, I will get as close as I can—well within twenty-five feet—to capture high-quality sound and video, speak to law enforcement officers about what's going on, and hear what people on the scene are saying to each other.

6.     When I'm covering newsworthy events, it would be much harder—and sometimes impossible—for me to do my job from 25 feet away.  To capture video footage, for example, I often need to be within 15–20 feet, if not closer, to get a clear picture of what's going on or to avoid an obstructed view.

2

**Supp. App. 2**

7.      To hear and record audio, I usually need to be even closer—within a normal conversational distance.  Beyond that, it's usually too difficult to capture usable sound.

8.      In addition, in my experience, I am able to gather more information at a scene when I ask questions of law enforcement or witnesses from a close distance because it feels more conversational.

9.      I first heard about HB 1186 through WTHR's coverage of the law when it was proposed in the statehouse, before it passed.  Since HB 1186 was enacted, I've talked about it with other journalists who, like me, are concerned about what the law will mean for our work.  I also received emails from management at WTHR telling us about the law after it passed.

10.     Since HB 1186 was enacted, there have been instances when I was covering a story where I was told by law enforcement to move back to a distance that got in the way of or prevented me from doing my job effectively.

11.     For example, in mid-October 2023, I was called up to work in the middle of the night to report from the scene of a shooting at a bar involving an off-duty law enforcement officer.  When I arrived, I began filming the scene outside the bar.  An officer told me to move back to where other journalists had been crowded into an area roughly the size of a parking space.  I would estimate that area was approximately 25 feet or more away from where I was initially standing.

**Supp. App. 3**

12.     From the area where I was directed to stand, a police car blocked me from having a clear view of what was going on outside the bar.  I wanted to get a better view of the scene, but I also didn't want to spend the night in jail so I stayed back from the scene—even though I was not in law enforcement's way or obstructing their investigation when I was asked to move.  I could see from where I was standing that officers were allowing bystanders who were not working as journalists to get closer to the scene.

13.     In my experience, in breaking news situations it is common for law enforcement to order members of the press to move back to what they often call a "media staging area" that might be as far as several blocks away from the scene or other newsworthy event that we are trying to cover, even when members of the public who are not there as journalists are allowed to get closer—and even film on their phones.  In my experience, law enforcement will single out people, like me, that they can see have television cameras and require them to stand further away.

14.     In general, I find it difficult and sometimes impossible to do my job as a journalist effectively from a media staging area.  I cannot, from a media staging area, gather news and information myself by, for example, striking up a conversation with a law enforcement officer on the scene, or by recording audio and video of what is happening at the scene.  It is usually my practice as a journalist to move around when I'm on a scene so that I can take pictures from

4

**Supp. App. 4**

different angles, see all sides, and talk to as many people as I can. When I do this, I make a conscious effort to avoid interfering with officers' ability to do their jobs.

15.    When reporting in those kinds of situations, following a law enforcement order to move back at least 25 feet, or to move to a media staging area, will mean that I will lose access to newsworthy information. I can never know what newsworthy information I'm missing when I am forced to move away or move to a media staging area. In those situations, my reporting from the scene is limited to the information that law enforcement decides to share.

16.    Since HB 1186 went into effect, I've continued to interact with law enforcement on a regular basis in connection with my work as a photojournalist for WTHR, and I frequently have the law on my mind when I'm trying to gather news. I've continued to do my job, but I'm conscious that if I don't comply quickly with law enforcement requests to move I could be arrested, even when I haven't interfered with the law enforcement officer's ability to perform their duties.

17.    I'm also concerned about HB 1186 because, when I'm reporting, I frequently find myself in situations where it would be difficult or impossible to comply with an order to move at least 25 feet back. For example, when I cover events happening indoors in enclosed spaces, or when I cover crowded outdoor events like protests, there is often not enough space to move back, let alone 25 feet back. Recently, for instance, I covered a scuffle that broke out outside a courtroom

**Supp. App. 5**

in the Marion County courthouse.  I would estimate that I was within 5–10 feet of the scene.  Because of the enclosed space, I would have had nowhere to go if a law enforcement officer had ordered me to move at least 25 feet away.

18.    Also, when law enforcement officers are stationed throughout a large crowd—something I've seen at major football games that I've covered—I don't know how I would move at least 25 feet away from one officer without ending up within 25 feet of another officer.

19.    In addition, in my experience, law enforcements officers will give contradictory guidance to members of the press covering events, such as one officer telling journalists they can approach and another officer telling journalists to move back.  That also makes me concerned about HB 1186 because I could find myself at risk of violating the law while covering a newsworthy event because of confusing or contradictory directions given by law enforcement even though I am attempting to comply with law enforcement directions.

20.    As a professional photojournalist, I expect that my work will continue to bring me within 25 feet of law enforcement officers several times each week for the foreseeable future.  Even though I take care to avoid interfering with officers' duties, I am concerned that HB 1186 will continue to negatively interfere with my ability to do my job, which is to gather and report newsworthy information.

I declare under penalty of perjury that the foregoing is true and correct.

**Supp. App. 6**

Executed on November 10, 2023 in Indianapolis, Indiana.

Ryan Thedwall

Prepared by:

Katie Townsend
Reporters Committee for Freedom of the Press
1156 15th St. NW Suite 1020
Washington, D.C. 20005

**Supp. App. 7**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANOPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805-JRS-MG |
| *Plaintiffs*, |  |
| v. |  |
| TODD ROKITA, *in his official capacity as Attorney General of Indiana, and* RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff*, |  |
| *Defendants*. |  |

## DECLARATION OF SCOTT HUMS

I, Scott Hums, declare as follows:

1.    I am over the age of 18.  I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.  I have personal knowledge of the matters stated herein.

**Supp. App. 8**

2.    I am the Director of Content at WTHR in Indianapolis, Indiana, a broadcast television station owned by TEGNA, Inc.  I have been in my current position for over a year, and I have worked at WTHR for approximately eight years.  I also have personal experience with photojournalism, having worked as a news photographer for approximately seven years earlier in my career.

3.    In my role as Director of Content at WTHR, I oversee the work of WTHR reporters and photojournalists and make decisions about where to allocate newsroom resources.

4.    I oversee the work of reporters and photojournalists at WTHR—many of them general assignment reporters—who cover breaking news in Marion County, Indiana and who, as part of that work, come into close contact with law enforcement officers multiple times every day.  Our coverage of recent police-involved shootings, for instance, has often involved covering law enforcement officers at close range.  Our reporters also routinely encounter officers at scheduled events, press conferences, and at crime scenes.

5.    When I instruct our reporters and photojournalists about best practices for covering breaking news, I emphasize a famous rule in broadcast newsgathering: "Zoom with your feet."  While our journalists are required to take care to avoid interfering with law enforcement officers' carrying out their official duties, zooming in on your subject with a camera is not a substitute for getting

2

**Supp. App. 9**

physically close enough to an event so that you can see and hear things more clearly, capture quality audio and video, and get a clear perspective on what's happening.

6. From my own experience working as a news photographer and in newsroom management, I know you generally need to be within 5-10 feet away to record audio that is consistently acceptable for broadcast. If there is background noise, you need to be even closer. I also know from experience that professional journalists are capable of working from that distance without negatively impacting or interfering with law enforcement officers.

7. High-quality audio and visuals (including photos and video footage), are uniquely valuable to WTHR viewers and, accordingly, to WTHR; both help transport viewers to what is happening on the scene. That's especially true for breaking news, which is a strategic focus for WTHR because we know that our audiences want accurate, up-to-the-minute coverage of the issues affecting their community—especially law enforcement issues that might affect their safety.

8. Our journalists also need to be close to get to the truth. With police-involved shootings, for instance, it has been my experience that, if our reporters are too far away to get a clear view of the scene, they have no way of knowing what questions to ask to see if law enforcement's initial account of what happened matches the facts on the ground.

**Supp. App. 10**

9.    I learned about HB 1186 when it was introduced in early 2023. WTHR's newsroom leadership—myself included—was immediately concerned about the impact the law would have on our journalists and their ability to do their jobs effectively. Once HB 1186 was signed into law, I worked with other members of WTHR leadership to make sure our reporters and photojournalists were aware of it.

10.    Since the law took effect, reporters and photographers that I supervise have repeatedly expressed concerns about how HB 1186 impacts their ability to gather the news or asked me for guidance about how the law would apply to a particular set of circumstances. I have been a part of efforts to educate the WTHR newsroom about HB 1186. We advise our reporters and photojournalists to comply with the law and to avoid getting in the way of law enforcement officers doing their jobs, but it has been challenging to give journalists workable guidance on how to estimate twenty-five feet when out in the field, what to do if an officer walks towards you after asking you to step back, what to do if you don't have enough space to back up, and what to do when officers give conflicting orders.

11.    Based on my own experience and the experiences of the WTHR journalists I supervise, I would estimate that a member of the WTHR newsroom is asked to step back or move away from a law enforcement officer as often as once a day. Journalists I supervise are often asked to stay back or move to a different

**Supp. App. 11**

area—sometimes to what is often called a "media staging area"—even when they can see members of the public being permitted to get closer to the scene.

12.    I have reviewed examples of stories broadcast by WTHR since HB 1186 was enacted in which viewers can clearly see that members of the public have been allowed to get closer to an event than where our reporters were directed to stand. *See Arrest Made in Officer-Involved Shooting on Indy's East Side*, WTHR (Oct. 16, 2023), https://www.youtube.com/watch?v=SWU-ztyHCVc.

13.    Because of this, I have sometimes advised WTHR journalists to use their phones to cover an event instead of a large camera so that they can blend in with the public and avoid being targeted by law enforcement with an order to move back or away from the scene.

14.    Because WTHR's coverage areas will continue to bring our reporters and photojournalists within 25 feet of law enforcement officers virtually every day for the foreseeable future, I am concerned that HB 1186 will continue to be used to arbitrarily prevent our journalists from getting close enough to gather the information they need to inform the public, despite the fact that our journalists are careful not to obstruct law enforcement officers' ability to carry out their official duties. And because I have personal knowledge of incidents, as described above, in which our journalists have been singled out when members of the public were

**Supp. App. 12**

not, I am also concerned that HB 1186 could be used to single out our journalists relative to other members of the press depending on officers' perception of WTHR.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 10 , 2023 in Indianapolis, Indiana.

Scott Hums

Prepared by:

Katie Townsend
Reporters Committee for Freedom of the Press
1156 15th St. NW Suite 1020
Washington, D.C. 20005

6

**Supp. App. 13**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANOPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805-JRS-MG |
| *Plaintiffs*, | |
| v. | |
| TODD ROKITA, *in his official capacity as Attorney General of Indiana, and* RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff*, | |
| *Defendants*. | |

**DECLARATION OF ROBERT SCHEER**

I, Robert Scheer, declare as follows:

1.      I am over the age of 18.  I make this declaration in support of

Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.  I have

personal knowledge of the matters stated herein.

1

**Supp. App. 14**

2.     I am a visual journalist at the Indianapolis Star ("IndyStar"), a daily newspaper in Indianapolis, Indiana owned by Gannett, Inc. I have been working as a professional photojournalist since June or July of 1994. I worked for several California-based news outlets until I began working for the IndyStar on June 1, 1998.

3.     I am a member of Indiana Professional Chapter of the Society for Professional Journalists ("Indiana Pro SPJ") and have been for [4] years. I have served on the board of Indiana Pro SPJ since May of 2019.

4.     At the IndyStar, my job is to capture images and video for anything that might be published by the IndyStar. I cover everything from shootings, fires, natural disasters, sports games, long-term investigative projects, and concerts to portraiture and food photography.

5.     My job usually brings me in close proximity to law enforcement approximately every other week, sometimes more frequently depending on the news cycle. If there are major protests happening in Indianapolis, for instance, I will come into contact with law enforcement officers every day, likely multiple times a day.

6.     Attached as Exhibit A are true and correct copies of still images I made in the course of doing my job within 25 feet of law enforcement officers.

**Supp. App. 15**

7.    When my work requires me to be near law enforcement officers, I will sometimes be within a few feet away of them, depending on the situation. The more people that are in the area, the closer I tend to get, in order to avoid an obstructed view. I am sometimes within arms-length distance of law enforcement officers, but I always make a point of avoiding interfering with their duties.

8.    I often want to get this close because of a saying in photojournalism that I learned when I was first starting my career: "If the photo's not good enough, it's because you're not close enough." My job is to accurately tell the story of what's happening to people in our community, and, in my experience, that often requires me to get within 25 feet of law enforcement officers.

9.    My job involves making both still images and video, which includes audio. In my experience, I need to be within—at most—ten feet of what I am recording to capture usable audio. I usually aim to get within one or two feet of what I am recording to capture the best quality audio.

10.    I first heard about HB 1186 from fellow journalists in the IndyStar newsroom after it was first proposed. I also have received emails from Indiana Pro SPJ alerting members of the organization about the law.

11.    I have discussed the law with my colleagues at IndyStar. They uniformly share my concern that the law interferes with our ability to do our jobs. One day, some of my fellow IndyStar journalists and I attempted to guess how far

3

**Supp. App. 16**

25 feet was without measuring. We each put markers down at different places in the newsroom and then measured. No one was able to estimate that distance correctly; 25 feet was farther away than any of us had estimated.

12. Even after that exercise, I am not confident in my ability to judge how far away 25 feet is when I am on the job in the field. In my experience, there are also circumstances where that distance would make it too difficult for me to capture good quality, usable images or audio for the IndyStar.

13. For instance, about a year ago, I went to Castleton—a neighborhood in North Indianapolis—to cover a shooting that had taken place at a mall there. I walked up to the edge of the police tape, and there were plenty of people walking around in the same area. An officer approached me and asked me to stand with other journalists in a media staging area that I would estimate was at least 350 feet away from where I was at the time. In my experience as a news photographer, being confined to a media staging area deprives me of the ability to document the scene effectively. Because I understood the officer's request to be voluntary, and because I knew that I was not impeding anything officers were doing by taking pictures in an area where members of the public were mingling freely, I did not withdraw to the media staging area. Instead, I moved to a different angle at roughly the same distance and continued to make pictures from there.

4

**Supp. App. 17**

14.    If a similar encounter took place today, I would be more likely to comply with the officer's request to move to the media staging area in order to avoid the risk of being arrested under HB 1186, at the cost of any images or audio I wouldn't be able to capture from that distance.

15.    I have regular contact and expect I will continue to have regular contact with law enforcement officers while doing my job as a photojournalist. Since HB 1186 became law, I am often conscious of the risk that the law will be enforced against me, especially in circumstances where it would be virtually impossible for me to comply.  For example, when I cover crowded events, particularly ones where people are agitated—such as a protest or a sporting event—I know from experience that I would struggle to get through a crowd if I were ordered by law enforcement to move at least 25 feet away.

16.    I also know from experience that I would be unable to see what is going on at that distance.  For instance, when a law enforcement officer uses force against a protestor or protestors at a large demonstration, in my experience, it is often impossible to see—and therefore photograph—the point of contact between law enforcement and the public unless I am up close and in the crowd.  But those images are often essential to allowing the public to understand how the event unfolded.

**Supp. App. 18**

17.    I expect that my work as a visual journalist for IndyStar will continue to bring me in close proximity to law enforcement officers on a regular basis for the foreseeable future.  I am concerned that HB 1186 will continue make it harder for me and my colleagues to do our jobs, which is to report the news and show the people of Indianapolis what is going on in their community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 1, 2023 in Indianapolis, Indiana.

Robert Scheer

Prepared by:

Katie Townsend
Reporters Committee for Freedom of the Press
1156 15th St. NW Suite 1020
Washington, D.C. 20005

**Supp. App. 19**

# EXHIBIT A



## File information

Dimensions: 2800x2017 pixels
Dimensions in inches:  9.33"/6.72"
Dimensions in picas:  56P/40.34P
File Type: image/jpeg
File Size: 3.1 MB
At 200 dpi printable up to 35.56 x 25.62 cm.

## PacersSpurs_RS_072.jpg
Robert Scheer/IndyStar

-

IMPD Sgt. Ron Brezik helps Matt Hayden with his gloves, as Hayden
gets ready to work behind the bench, getting water ready for players,
San Antonio Spurs at Indiana Pacers, Bankers Life Fieldhouse,
Indianapolis, Monday, February 13, 2017.    **Supp. App. 21**



## File information

Dimensions: 3504x2336 pixels
Dimensions in inches: 11.68"/7.79"
Dimensions in picas: 70.08P/46.72P
File Type: image/jpeg
File Size: 3.4 MB
At 200 dpi printable up to 44.50 x 29.67 cm.

INIBrd_02-19-2017_Star_1_B004~~2017~02~18~IMG_XXX_GPNDC5_5P9QRIKWA_4_1_5IHF7T02_L977920502~IMG_XXX_GPNDC5_5P9QRIKWA_4_1_5IHF7T02.jpg
**Robert Scheer**
**Robert Scheer, USA TODAY Network -**

Robert Scheer, USA TODAY Network
Norma McCorvey is arrested amid a 2009 protest at Notre Dame, where President Obama was speaking to students.

Norma McCorvey, known as the "Roe" in Roe V. Wade, is arrested just inside the gate of Notre Dame, on the day President Barack Obama is due to speak to students at the day's commencement ceremony, South Bend, Ind., May 17. 2009. **Supp. App. 22**



## File information

Dimensions: 2400x2009 pixels

Dimensions in inches:  8"/6.7"

Dimensions in picas:  48P/40.18P

File Type: image/jpeg

File Size: 2.3 MB

At 200 dpi printable up to 30.48 x 25.51 cm.

**01_renn.jpg**

**Robert Scheer / The Star**

-

IMPD Sgt. Steve Staletovich puts up memorial signage to honor
Officer Perry Renn, who was killed a year ago near this site,
Indianapolis, Tuesday, July 7, 2015.    **Supp. App. 23**



## File information

Dimensions: 2400x1617 pixels
Dimensions in inches: 8"/5.39"
Dimensions in picas: 48P/32.34P
File Type: image/jpeg
File Size: 2.2 MB
At 200 dpi printable up to 30.48 x 20.54 cm.

## 52_protest07_RS.JPG
Robert Scheer/IndyStar

-

Police officers stand near a demonstration of at least two hundred people in downtown Indianapolis, demanding IMPD accountability following the killing of Dreasjon "Sean" Reed, who was shot during a police pursuit a day earlier, Wednesday, May 7, 2020.

**Supp. App. 24**



## File information

Dimensions: 2400x1659 pixels
Dimensions in inches: 8"/5.53"
Dimensions in picas: 48P/33.18P
File Type: image/jpeg
File Size: 2.5 MB
At 200 dpi printable up to 30.48 x 21.07 cm.

### 05_downtownwoes_RS.JPG
**Robert Scheer/The Indianapolis Star**

-

IMPD officers investigate the scene of an earlier stabbing on the sidewalk near City Market, Indianapolis, Tuesday, Aug. 18, 2020. Some downtown business owners have become frustrated with growing crime issues downtown and are looking for more solutions from the city.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANOPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805-JRS-MG |
| _Plaintiffs,_ | |
| v. | |
| TODD ROKITA, _in his official capacity as Attorney General of Indiana, and_ RYAN MEARS, _in his official capacity as Marion County Prosecutor,_ and KERRY FORESTAL, _in his official capacity as Marion County Sheriff,_ | |
| _Defendants._ | |

**DECLARATION OF REX SMITH**

I, Rex Smith, declare as follows:

1.     I am over the age of 18.  I make this declaration in support of

Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.  I have

personal knowledge of the matters stated herein.

1

2.    I am a reporter and anchor at WANE 15, a broadcast television news station owned by Nexstar Media, Inc., that covers Fort Wayne, Indiana, and surrounding areas.  I have been employed full-time as a journalist at WANE 15 for approximately two years.  Before joining WANE 15, I was a sports anchor at a television news station in Omaha, Nebraska. I also worked at a different television news station in Fort Wayne before joining WANE 15.

3.    At WANE 15, I work on the general assignment team.  I report on events happening throughout the city, big and small.  For example, I have reported on breaking news about a shooting, profiles of prominent citizens in Fort Wayne, and issues with trash collection.

4.    In a typical work week, I usually come into contact with law enforcement officers on the job at least once or twice.  That can happen when I'm covering crime scenes and breaking news, but also when I'm working on special reports on broader issues that involve law enforcement.

5.    When I'm covering news that puts me in close proximity to law enforcement, I often need to get close to officers.  If I am covering a fire, for instance, and there are police on the scene, I'll be right near them.  I need to get that close to get the best quality video I can.  To get good quality audio, I also need to be well within twenty-five feet.

Supp. App. 27

6.    I first heard about HB 1186 through a discussion with a colleague in the newsroom. We talked about our concerns about how it might impact our work as journalists, including our ability to effectively cover events where law enforcement are present.

7.    I am also concerned about how HB 11086 will impact the bystander-contributed videos of law enforcement that members of the public routinely send to us to further our journalistic work. We broadcast bystander-contributed videos all the time, particularly when we are reporting on fires or crashes in rural areas that are hard to get to quickly from Fort Wayne. Without those bystander-contributed videos, our team would often have no way of covering the key, early moments of a newsworthy event before our reporters are able to reach the scene. Many of those videos are taken within twenty-five feet of law enforcement officers.

8.    For example, our team recently aired a video captured by a bystander's cell phone of a law enforcement officer body slamming a man he had pulled over. Our team not only aired the video the bystander sent to us but also continued reporting on the story ourselves. *See* Lydia Reuille and Clayton McMahan, *Court Docs: Officer Performed 'Hip Toss,' Man 'Fell to the Ground' in Viral Video*, WANE 15 (Jan. 24, 2023), https://perma.cc/2VZC-RQSU. Among other things, we submitted a public records request to the Fort Wayne Police Department to obtain bodycam footage of the incident. *See* Clayton McMahan,

**Supp. App. 28**

*Fort Wayne Police Department Releases Bodycam Footage From Viral 'Hip Toss' Arrest in Late January*, WANE 15 (May 23, 2023), https://perma.cc/VY49-BATX.

9.    If our source—the bystander who contributed the video—had been forced to stand at least twenty-five feet away, we likely would not have obtained video of a high enough quality to air, and we probably wouldn't have been able to pursue subsequent stories about the incident.  The public would have lost out on the opportunity to understand what happened.  In light of what I've heard about HB 1186 being used against bystanders filming the police, I worry HB 1186 will prevent sources from bringing us those types of videos—which play a key role in our reporting—in the future.

10.    When my work brings me in close proximity to law enforcement officers, I make sure to stay out of their way when they need space.  If I'm not doing anything to obstruct their work, I believe that I'm within my rights to do my work, which includes obtaining video and audio of the scene.

11.    If HB 1186 were enforced against me, I think I would have difficulty complying, including because I would have a very difficult time estimating a distance of twenty-five feet without a tape measure.  And because the law is so vague, it isn't clear when someone can be ordered to back up to twenty-five feet, and what would prompt an officer to decide to enforce the statute.

4

**Supp. App. 29**

12.     I'm also concerned about what HB 1186 will mean given other changes I've noticed in law enforcement's attitudes towards the press. Though I think I have a good relationship with the Fort Wayne Police Department, in the past few years I've noticed that it has become harder to get information about newsworthy events from them. Sources are less willing to talk to journalists, and Public Information Officers are more reluctant to release information. Given those experiences, I worry that HB 1186 will be used as another tool to keep information about law enforcement activities away from the public. That will make it harder for me to do my job as a journalist, which requires holding officials accountable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 27, 2023 in Fort Wayne, Indiana.

Rex Smith

Prepared by:

Katie Townsend
Reporters Committee for Freedom of the Press
1156 15th St. NW Suite 1020
Washington, D.C. 20005

**Supp. App. 30**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANOPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805-JRS-MG |
| *Plaintiffs,* | |
| v. | |
| TODD ROKITA, *in his official capacity as Attorney General of Indiana, and* RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff,* | |
| *Defendants.* | |

**DECLARATION OF LISA ZYCHERMAN**

I, Lisa Zycherman, declare as follows:

1.      I am over the age of 18.  I make this declaration in support of

Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.  I have

personal knowledge of the matters stated herein.

1

**Supp. App. 31**

2.     I am the Deputy Legal Director and Policy Counsel at the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "RCFP"), a nonprofit association founded by journalists and media lawyers in 1970. Today, Reporters Committee's attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. I have been in my current position for over two years. Prior to joining the Reporters Committee, I worked as a media lawyer in private practice for approximately sixteen years.

3.     In my role as Deputy Legal Director and Policy Counsel, I work with other Reporters Committee attorneys to determine where to allocate our organization's limited resources based on the demand for the legal services of Reporters Committee's attorneys and the most urgent threats to press freedom.

4.     I also oversee the legal work of a number of Reporters Committee attorneys, including our Local Legal Initiative attorneys. Through the Local Legal Initiative, Reporters Committee attorneys provide no-fee legal services to support journalists and news organizations engaged in local enterprise and investigative reporting in their states. We currently have Local Legal Initiative attorneys in Colorado, Oklahoma, Pennsylvania, and Tennessee. The Reporters Committee is expanding its Local Legal Initiative to Indiana.

**Supp. App. 32**

5.      I anticipate an increased need for Reporters Committee attorneys'
legal services for journalists in Indiana because of Ind. Code § 35-44.1-2-14 ("HB
1186" or the "Act"), and the Reporters Committee already has diverted resources
to address the burdens imposed by the Act.

6.      For one, the Reporters Committee has allocated the time of its
attorneys who would otherwise have dedicated their time to providing other legal
services to journalists, including staff attorney Grayson Clary and Technology &
Press Freedom Project fellow Emily Hockett, to the above-captioned challenge to
the constitutionality of HB 1186.

7.      The Reporters Committee also has published new resources to educate
Indiana journalists about HB 1186[1] and intends to update its existing resources to
address the law's impact on newsgathering in Indiana.  Reporters Committee
attorneys also intend to conduct trainings for journalists and newsrooms in Indiana
to inform journalists about the Act and its effect on newsgathering.

8.      In my experience, we also see increased use of the Reporters
Committee's legal hotline (*see* www.rcfp.org/hotline) when events, such as
protests, bring working journalists and law enforcement officers in close proximity

---

[1]      *See, e.g.*, Emily Hockett, *Efforts to Criminalize 'Encroachment' on Police
Encroach on First Amendment Rights*, Reporters Comm. for Freedom of the Press
(June 26, 2023), https://perma.cc/B2HA-L7QN.

to one another.  I anticipate increased use of our legal hotline by journalists in

Indiana because of HB 1186.

9.    In short, responding to the Act has diverted the time and attention of

Reporters Committee attorneys who otherwise would have dedicated their efforts

to addressing other legal threats to journalism.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 29, 2023 in Washington, D.C.

Lisa Zycherman

Prepared by:

Katie Townsend
Reporters Committee for Freedom of the Press
1156 15th St. NW Suite 1020
Washington, D.C. 20005

**Supp. App. 34**